## TOWN OF OYSTER BAY v. STEHLI.

(Supreme Court, Appellate Division, Second Department. July 30, 1915.)

1. PUBLIC LANDS ⊜⟶196½—COLONIAL GRANTS—PRESUMPTION AND BURDEN OF PROOF.

In ejectment to recover a strip of beach land above high-water mark on Long Island Sound, the plaintiff town claimed under the Andros patent of September 29, 1677, describing land bounded by the Sound on the north, the Atlantic Ocean on the south, and two towns, respectively, on the east

and west, excepting other patent rights or lawful claims. 1 Colonial Laws, p. 62, provided that all records of sales or conveyances should be transmitted for record, and an order of the assizes of 1670 (1 Colonial Laws, p. 83) provided for recording deeds on the penalty of having the benefit of priority if a later deed should be first recorded. *Held* that, assuming that the plaintiff had the burden of proving that there were no other patents falling within the exception, it was met, as to patents, by presenting all of record discoverable by reasonable search.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 622; Dec. Dig. ⬤⟿196½.]

2. PUBLIC LANDS ⬤⟿191—COLONIAL GRANTS—EXCEPTION—VERBAL GRANTS.

In such case, the exception of other "lawful claims" was a general precautionary term, protecting any who could lawfully claim an interest, and grants by word of mouth with livery of seisin were excluded therefrom, since the Duke of York's Laws of 1665 (1 Colonial Laws, pp. 30, 31) declared that no alienation should be good, except done by deed in writing under hand and seal and delivered and possession given, and that conveyances should be recorded.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 614; Dec. Dig. ⬤⟿191.]

3. PUBLIC LANDS ⬤⟿225—INDIAN DEEDS.

Under Duke of York's Laws March 1, 1665 (1 Colonial Laws, p. 40), Indian deeds of lands in New York colony were insufficient to convey title, unless made with leave of the Governor and a grant from him and acknowledgment of payment by the grantee.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 726; Dec. Dig. ⬤⟿225.]

4. PUBLIC LANDS ⬤⟿226—DEEDS FROM INDIANS—RECORDED INDIAN DEEDS—PRESUMPTION AND BURDEN OF PROOF.

Where none of the Indian deeds set up by defendant covered the locus in quo, it could not be supposed that the Indians made other grants that did cover it, and base thereon a presumption of the confirmation required by law so as to compel the plaintiff to show affirmatively that such was not the fact.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 727; Dec. Dig. ⬤⟿226.]

5. PUBLIC LANDS ⬤⟿227—COLONIAL GRANTS—"BEACH."

In ejectment to recover a strip of beach land above high-water mark on Long Island Sound, claimed by plaintiff town under the Andros patent of September 29, 1677, *held* that, though the word "beach" in the grant ordinarily means beach washed by the sea, yet, where the language showed a contrary intent, such grant did not extend "across ffoxe Island," or to its northerly limit to high-water mark.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 728; Dec. Dig. ⬤⟿227.

For other definitions, see Words and Phrases, First and Second Series, Beach.]

6. BOUNDARIES ⬤⟿33—PRESUMPTION—LINE.

A line in a deed, described as running "to ffoxe Island," was presumably a straight line.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 146–152; Dec. Dig. ⬤⟿33.]

7. EVIDENCE ⬤⟿67—PRESUMPTION—CONTINUANCE OF BOUNDARY.

Where a certain highway is named as a boundary, it will be presumed to be now where it was when the deed was executed.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 87, 88, 103; Dec. Dig. ⬤⟿67.]

8. BOUNDARIES ⚙⟶14—WATERS—CONSTRUCTION OF GRANT.

An Indian deed in 1669, prior to the patent under which the plaintiff town claimed, conveying land by the description: "Joyning on ye south end to Matthy-Priany bounds and on ye west side with the ffootway, & on ye East side wth ye Salt Meadowes & soe to runn upon an Even Breadth to ye Salt Meadow on ye North end; wch wee gave to Capt. Jno. Underhill" was not a conveyance to high-water mark.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 102–107; Dec. Dig. ⚙⟶14.]

9. EJECTMENT ⚙⟶95—SUFFICIENCY OF EVIDENCE—CHAIN OF TITLE.

In ejectment to recover a strip of beach land above high-water mark claimed by plaintiff town under a patent, wherein defendant claimed under Indian deeds, evidence, including the deeds forming defendant's chain of title and the testimony of one in possession thereunder, *held*, as regards the land in question, insufficient to show any grant from the sovereign or any person in possession.

[Ed. Note.—For other cases, see Ejectment, Cent. Dig. §§ 280–295; Dec. Dig. ⚙⟶95.]

Appeal from Trial Term, Nassau County.

Ejectment by the Town of Oyster Bay against Emil J. Stehli. Judgment for defendant, and plaintiff appeals. Reversed, and new trial granted.

Argued before JENKS, P. J., and THOMAS, STAPLETON, and RICH, JJ.

Henry A. Uterhart, of New York City (John J. Graham and Alfred M. Schaffer, both of New York City, on the brief), for appellant.

Lynn C. Norris, of Brooklyn, for respondent.

THOMAS, J. The action is in ejectment to recover a strip of beach land above high-water mark on Long Island Sound. The appeal is from a judgment upon a verdict directed for the defendant. The defendant relies (1) upon his own title; (2) upon lack of proven title in the plaintiff.

[1] The plaintiff would trace title to the Andros patent of September 29, 1677, to the town of Oyster Bay, which described land bounded by the Long Island Sound on the north, by the Atlantic Ocean on the south, and by the towns of Huntington and Hempstead, respectively, on the east and west. Within such boundaries is the disputed strip, which is delineated as 100 feet in width on each side of the center line of the highway to Locust Valley as extended northerly to the water. But the Andros patent, after the description and the habendum clause, has this:

"The tenur of the said Land and premises to bee according to the Custome of the Mannour of East Greenwich in the County of Kent in England in free & Common Soccage and by Fealty onely provided alwaies notwithstanding that ye extent of ye bounds before recited do no way prejudice or infringe the particular Propriety of any person or persons who have right by patent or other Lawful Claime to any part or parcell of Land or Tenements within the Limnitts aforesaid. Only that all ye lands & Plantacons within the said Limmitts or bounds shall have Relacon to the Towne in General for the Well Government thereof."

The defendant insists that the proviso, which the parties unite in calling an exception, may exclude the locus in quo, and that the plain-

---

tiff must show affirmatively, and to a greater degree of certainty than it has, that no other person by patent or other lawful claim had right to it at the date of the Andros patent in 1677. The plaintiff answers that it has shown that there are but three patents of record, none of which covers the place, and that diligent search has revealed no other recorded patents. Assuming that the burden of proving that there are no patents or lawful claims falling within the protection of the proviso does rest upon the plaintiff, I think that it fulfilled it as to patents by presenting all of record discoverable by diligent search. What more could be done? Possibilities are exhausted, and only conjecture is left. It may be imagined that there are unrecorded patents. But the Duke of York's Laws of March 1, 1665 (Colonial Laws, vol. 1, page 62), provided:

"All Records of Bargaines and Sale, or any other Conveyances Administrations or Probates. of will within the North and West Riding, shall be Transmited to the Office at New Yorke, with the fees Ordained for the Records, within one Moneth after the Record shall be made in the Courts, If in the East Riding within two Moneths."

An order of the assizes of 1670 (Colonial Laws, vol. 1, p. 83) provides:

"6. That ye Law for Recording of Deeds be put in Execution and ye penaltyes of having ye benefitt of Priority, if a later Deed shall be first recorded."

While the failure to record a deed would not impair its protection by the proviso, yet I think that there is a presumption in favor of the record of all existing patents, especially in view of the laws then in force. It is always to the record primarily that resort is had to discover interests in land derived through deeds, although possibly there may be persons who have not recorded their deeds. But in my judgment the record, in the absence of opposing evidence, shows sufficiently what grants have been made.

[2] But the proviso protects "right by patent or other Lawful claime." Other "Lawful claime" was a general precautionary term to protect any to whom patent had not been issued, but who could lawfully claim an interest. The defendant suggests, as falling within the intendment, grants by word of mouth with livery of seisin. But the Duke of York's Laws of 1665 (Colonial Laws, vol. 1, pp. 30 and 31) provide:

"That henceforth no Sale or alienation of Houses and Lands within this Government, shall be holden good in Law except the same be done by Deed in writing under hand and Seal and delivered and *possession* given upon part in the name of the whole by the Seller or his Attorney so authorized under hand and seale, *Unlesse the said Deed be Acknowledged and Recorded according to Law.* * * * And for the Recording of all such Grants, Sales, and Mortgages, That every Clarke of every Court of Sessions shall enter all such Grants, Bargains, Sales, and Mortgages of Houses Lands, Rents and Hereditaments as aforesaid together with the estates of the Granter and Grantee; things and Estates granted, together with the Date thereof."

It is also suggested that deeds from the Indians would fall within the term. But Indians could, by themselves alone, create no lawful claim. Town of Southampton v. Mecox Bay Oyster Co., 116 N. Y. 1, 22 N. E. 387, where the same proviso was in the patent; John Clarke

Estate v. City of New York (2d Dept., February 5, 1915) 165 App. Div. 873, 151 N. Y. Supp. 714. The Duke of York's Laws (March 1, 1665, p. 40) provide:

"No Purchase of lands from Indians After the first day of March, 1664, shall be Esteemed a good Title without leave first had and obtained from the Governour and after leave so obtained, The Purchasers shall bring the Sachem and right owner of such Lands before the Governoure to acknowledge satisfaction and payment for the said Lands whereupon they shall have a grant from the Governoure And the Purchase so made and prosecuted is to be entered upon record in the Office & from that time to be valid to all intents and purposes."

The Colonial Laws (volume 1, page 149), of October 23, 1684, also provide:

"Noe Purchase of Lands from the Indians shall bee esteemed a good Title without Leave first had and obtained from the Governor signified by a Warrant under his hand and Seale and entered on Record in the Secritaries office att New Yorke and Satisfaction for the said Purchase acknowliged by the Indians from whome the Purchase was made which is to bee Recorded likewise which purchase soe made and prosecuted and entered on Record in the office aforesaid shall from that time be Vallid to all intents and purpoases."

The parties have introduced many Indian deeds, and none of them cover the locus in quo. It is not presumable that Indian deeds covering the place have been discovered and withheld from the court. If any Indian deed known to exist includes the parcel, the·court, in the absence of overruling adverse evidence, could infer from the record of it, title in one claiming under it.

[3] But if none of the deeds cover the locality, it should not be imagined that the Indians made other grants that did, and base on that fancy a presumption of confirmation, to the end that the plaintiff be compelled to show affirmatively that such is not the fact. That would be piling a supposition upon a hypothesis, and requiring the plaintiff to prove its nonexistence. There must be, as regards the proviso, some point of at least momentary rest for the town of Oyster Bay and those claiming under it. Otherwise, no one could ever trace title to the Andros patent. The person in possession in such case could always object that the claimant had not looked far enough, and that further search would discover that, before 1677, the date of the patent, there had been a prior conveyance of the beach falling within the proviso. So search would never be definite, although in reason nothing discoverable could be expected.

[4-6] Two Indian deeds are invoked to show title out of the plaintiff. The first is to Capt. John Underhill, dated March 10, 1667, and the confirmatory deed of March 10, 1696, executed by Suscaneman, Chief of the Matenacok Indians, to Burdsall, which recites a former grant to Capt. John Underhill. These deeds could give no title, and I do not understand that there is evidence that any one has ever claimed under them the locus in quo, and yet the court is asked to infer in favor of one, a stranger to them and claiming title from other source, that "the grantees had complied with all the legal requirements and had obtained the necessary consents from the sovereign power," as was said in Jacob v. Town of Oyster Bay, 73 Misc. Rep. 283, 132 N.

Y. Supp. 657. The first deed states that the piece conveyed contains 150 acres, more or less,

"lying betweene Corne Creeks and the markt Tree, bounded by us Southward, and west rangeing with ye Lott of Nathan Burchill, as laid out with a small nooke of Meadow, *lying betweene Oke Neck Meadows and Racoune Swampe;* Bounded westward with three rocks lying in the said Meadow, with all Priviledges of Commanage for Timber, and Grasing, ffishing, ffowling, Hunting," etc.

The map shows Oak Neck Meadows east of the highway (I understand that there is no doubt about the location of such meadows); it also shows Raccoon Swamp, and the three rocks somewhat northwest of the swamp. If we turn to the confirmatory deed of March 10, 1696, which was after the Andros patent to the town, there is found something more specific. There is recital of deed to Underhill of

"a Certaine parcell of Meadow Lands Lying & being at Matenacock now within ye bounds of ye patten of Oysterbay at ye *South Side of ye Long Beach or ffoxe Island Beach* and Bounded as ffolloeth the ffirst Bounder is ye three rocks Lying about ye middle way between Racoone Swamp and Dayton Swamp, and from ye said three Rocks Northward to ffoxe Island on ye Long Beach aforesd and from ye said ffox Island Eastward on ye said Beach to ye Highway that comes on to the said Beach Leading to Oake Neck; and so from ye said Beach at ye said Highway westward by ye wood edge to ye three Rocks aforementioned Containing all ye Meadows within ye said Bounds."

After such recital the deed grants:

"All that of ye above recited Meadow as above bounded, with all ye Cricks, Crick thatch, Springs Runs, Swamps, Pomds, Rivers, Grass, fresh and salt within ye bounds aforesaid * * * with all priviledges Costomes profits & Comodities whatsoever to ye samsis belonging or in any wise appertaining."

Following that description, the westerly boundary would begin at the three stones, which are identified, and run to Fox Island "on ye Long Beach aforesd." That line as described runs "to ffoxe Island" —not onto or across or within Fox Island. It is presumably a straight line. Kingsland v. Chittenden, 6 Lans. 15. That would take it to the southerly side of the island, to a point in a line on Long Beach. But the defendant's line, as alleged, would take it to the northerly side. Then the next line runs from

"ye said ffox Island Eastward on ye said Beach to ye Highway that comes on to the said Beach Leading to Oake Neck."

As the westerly line runs to Fox Island, and thence eastward on the beach, the first line would extend from the three stones to a point where Fox Island meets the beach, and from that point the northerly boundary would begin its course eastward. What, then, was meant by the word "beach"? Fox Island is on the beach, which is between high and low water, and is also on the beach between high water and the meadow. Which beach is meant? The beach intended is called by its name, "Long Beach." The deed earlier calls it Long Beach or "ffoxe Island Beach." The north line runs on that beach, which is identified by a name, "to ye Highway that comes on to the said Beach Leading to Oake Neck." The highway does lead somewhat onto the sandy strip or beach in its course to Bayville; but, so far as shown

diagrammatically or otherwise, it does not lead to high-water mark. Hence the northern line could not meet it there. Nor is the description that the north line shall meet the highway at its *extreme northerly point* on the beach, but that it shall run *to a highway* described as running onto the beach. As the highway made a turn to the eastward, it is improbable that it was carried easterly along high-water mark. At least, it is not there now, and the presumption is that it is now where it was then. Green v. Horn, 142 App. Div. 90, 92, 126 N. Y. Supp. 486.

The land conveyed is *meadow* land "at ye South Side of ye Long Beach or ffoxe Island Beach." The second deed clings to the word "meadow," using it three times, and the first deed deals with "a small nooke of meadow." Attention is not called to the discovery of subterranean meadow, as in Jacob v. Town of Oyster Bay, supra. The defendant would describe it as meadow land with a fringe of sand extending to high-water mark. But there was a beach of such dimensions that it gained a name that distinguished it as not meadow, but as a known locality. If the sandy strip was misnamed as meadow, then the land below high-water mark, shifting with the tide even to entire submergence, received a name. But if the name referred to the sandy strip, then the meadow conveyed laid south of it, for the deed so in terms locates it. Moreover, if the Indians intended to convey to the water, what more natural than to name the Sound as the manifast northern boundary? Why ignore the greatest monument that nature had placed before them, if it was meant to be the limit? The precision observed in running a line from the three stones to Fox Island, thence on Long Beach to meet the highway, and thence to the place of beginning, shows an attempt to fix definite corners in a triangular parcel of meadow.

The learned trial court was influenced by the language, not quite correctly quoted, "from Fox Island on the beach to the highway that comes on to the said beach leading to Oak Neck," to decide that the line would include the beach, within Trustees of Easthampton v. Kirk, 68 N. Y. 459, and People ex rel. Burnham v. Jones, 112 N. Y. 605, 20 N. E. 577. The exact language is:

"From ye said three Rocks Northward *to* ffoxe Island on ye Long Beach aforesd and from ye said ffox Island *Eastward* on ye said Beach to ye Highway that comes on to the said Beach Leading to Oake Neck."

But the primary and essential question is from what part of Fox Island the line shall run. The first line runs to Fox Island on the Long Beach—not Fox Island on the Sound. The words "on ye Long Beach" locate Fox Island on Long Beach—a place with a name. To that island the first line runs. Thence from Fox Island it runs on the beach to the highway. The starting point for the east is where the first line ends, and I cannot conceive that by running it to Fox Island on Long Beach the intention was to carry it across Fox Island, or to its northerly limit, or to high-water mark. Fox Island is upland. The line presumably did not run to the upland, and then proceed along it, much less across it. Although the word "beach" in a grant ordinarily would mean beach washed by the sea, yet that would be so in the absence of

language clearly showing a contrary intent. People ex rel. Burnham v. Jones, supra. While the absence of hostile words would let in the presumption that it was not intended to exclude the grantee from the water (Roe v. Strong, 119 N. Y. 321, 23 N. E. 743), such presumption is out of harmony with the description in the deed.

The learned counsel for the plaintiff suggests interestingly motives on the part of the Indians for retaining the beach; but, whatever the motive, I conclude that they did so. Underhill doubtless wanted the meadow, and was as indifferent to the sandy strip then as he and his successors have been since, so far as the record shows. The Andros patent boldly carried the northern boundary to the Sound, but existing rights within the extensive area conveyed were protected. I am not inclined to construe the Underhill parcel as excepted from the patent in favor of a defendant who, after affirming that it is excepted, and covers the disputed place, immediately seeks to trace an adverse title from another Indian deed, which I shall soon discuss. That is permitted in ejectment, but it does not strengthen the argument.

The town urges that it has exercised rights of proprietorship, and that men anciently respected its authority. John Budd and associates received, in 1739, a royal grant to operate a ferry between Rye and the town of Oyster Bay. In August of that year, Thomas Jones, Daniel Cock, and others were admitted to share in the enterprise. The instrument indicates that the new members bound themselves to provide a convenient landing on the south side of the Sound. On October 27, 1739, the town meeting of Oyster Bay "did make allot the whole and sole right of keeping and enjoying a ferry from the township of Oyster Bay, being across the Sound unto the township of Rye or to New England," to the parties who had been admitted to the royal grant of the 13th of July of the same year. In view of the recent royal grant and its entire inability to do so, it seems improbable that the town of Oyster Bay considered that it had power to grant a franchise as such, but rather, as plaintiff urges, the town had regard to the terminal facilities over which its patent extended. However, the language does not say that, and I do not regard the fact as probative. But it is part of a history that requires attention.

On May 28, 1740, one Henry Cock conveyed land to Thomas Jones, who had become at that time the owner of the ferry rights. This land was the site of the ferry house in the northeast corner of the upland and just west of the highway, and is now identified by the depression in the ground. The land was described as lying *"nigh unto the sound,"* and was limited by courses and distances, and the easterly line was run along by the highway *"to the edge of the beach,"* "containing within the said bounds three acres, be it more or less, with all the fences around the same." The words "nigh unto the sound," the line in a given course and for a given distance "to the edge of the beach," along a highway that did not run to high-water mark, and the suggestion of inclosing fences, indicate that the land went to the sandy beach, and not to high-water mark. But this grant is in defendant's chain of title, and he must reconcile the language with his claim, if he would

prevail. After Thomas Jones' death, his executors conveyed, on September 4, 1770, to Deborah Prindle:

"All our whole rights estate and interest in the house and lands at Matinacock Ferry lately belonging to our brother, Major Thomas Jones, with the land at Fox Island and the privilege of the Ferry from Oyster Bay to Rye."

On September 13, 1783, Enos Y. Prindle conveyed to Daniel Cock the land bounded

"*on the East by the Highway* leading from Matinecock to Oak Neck, on the North by the *Sound or East River, and on the West by the head of Simson's Creek* and on the South by the lands of Henry Cock, his land together with all my rights, titles, claim, and demand to a small Island known by the name of Fox Island, which said lands and Island were formerly the inheritance purchase and possessions of Major Thomas Jones, which he purchased of Henry Cook, Senr, and of the patentees of Oyster Bay."

So the grant to Thomas Jones in 1740, lying "nigh unto the sound" and extending "to the edge of the beach," with inclosing fences, was, in 1783, by Prindle carried to the Sound, with pretensions to Fox Island itself. The parcel was bounded on the west by the head of Simson's creek (now called Frost creek), which seems to have been farther easterly than at present, but not far enough to exclude the locus in quo. If any beach is conveyed, it would coincide in length with the northerly line of the three acres, which in Cock's deed was stated to be 20 rods. But the east line in Cock's deed ran "along by said highway," and, even if it went to the center of the highway, would include only a portion of the land in dispute, as half of its breadth is east of the center line of the highway. But it is quite time to go back and see what title Henry Cock Jones' grantor, had received, before following down the deeds from Daniel Cock, Prindle's grantee.

[7] On May 20, 1669 (that was before the Andros patent to the town), the Indians conveyed land to James Cock. If that deed conveyed the locus in quo, it did not pass under the Andros patent. ° But plainly it did not. The description is:

"Joyning on ye south end to Matthy—Priany bounds and on ye West side with the ffootway, & on ye East side wth ye Salt Meadowes & soe to runn upon an Even breadth to ye Salt Meadow on ye North end; wch wee gave to Capt. Jno Underhill."

That is not a conveyance to high-water mark. Indeed, the land conveyed to Underhill by the Indians, above considered, is shown by this last description to lie between Cock's grant and the Sound. And that harmonizes with the Indian deeds to Underhill and Burdsall, which carried the line from Fox Island to the highway.

[8] James Cock devised the land to his son Henry, whose executors in 1735 conveyed it to his son Henry Cock:

"That of his fathers Messuage and Tract of Land in Matenacock Called his homestead which is not already disposed of y said homestead is bounded on the South by the Highway between the Said Henry Cocks and ye Land in possession of y Isaac Dean & daniel Underhill Land and Swampe Down to the Creek thence Northard *to the Beach taking all the Meadow adjoining to it that was bought of John david & bounded on the North to a Small stripe of Meadow along by the Beach* and on the West by the Common Lands & all the land up on Oak Neck Devided and Undivided that is not already dispos-

es of and one Lott of Land Lying in matenacock neck Number seventeen and all his fathers right of Land in matinecock Purchase Not before Disposed of," etc.

The description shows an easterly boundary running "to the Beach" (what beach does not appear), and then comes "bounded on the North to a Small stripe of Meadow along by the Beach." But where did Henry Cock's father get such title, and how did he get the intervening meadow granted to Capt. Underhill? I can find no antecedent title that justified the grant to the Sound made by Prindle to Daniel Cock in 1783. But it was that same Henry Cock who conveyed in 1740 the three acres to Thomas Jones by the limited description above considered, to which in time Enos Y. Prindle succeeded, who conveyed to Daniel Cock, without any right that I can discover, by the words "on the North by the Sound or East River," as already considered.

But, going back to Daniel Cock, it may be seen what was done by him and his successors. The heirs of Daniel Cock, dying intestate, conveyed all his land to Peter Cock under the date of February 20, 1824, and Peter Cock's heirs, under the date of September 1, *1865*, conveyed to William H. and George W. Cock interests in land. The description of the first parcel, which alone is of interest here, shows definite courses and distances. The defendant indicates the boundaries on a map made by Surveyor Seaman. It shows an area of some 80 acres. I do not find, as to most of the lines, identity of distances, and the courses are not the same, in which last respect some variation might be expected. The surveyor began at the southwesterly side of Raccoon Swamp and ran easterly along an old stone fence to the westerly side of the highway, thence southerly along the highway 7 chains and 53 links (a distance given in the earlier deed), thence easterly along the land "formerly Cock" to the edge of the meadow, thence southeasterly along an old fence to a ditch, thence easterly and southerly along the ditch to the channel, thence northerly along the channel to lands of Tilly and others *to the highway, thence on a line at right angles to the Sound at high-water mark,* thence along high-water mark to a point directly opposite to Frost Creek Meadow, thence southerly along the meadow to the place of beginning. In this way the deed is made to take in, as is stated, several hundred feet of the Sound shore. There is some contention whether the surveyor has not carried his northerly line too far to the west before turning southerly on his last line. That is a matter of less present importance than is the result that the description does include some shore and the westerly part of the land in dispute, but, as I view it, not all of it. If the line went *to* the highway, and then at right angles to the Sound, it would not seem to take all the locus in quo.

But the inquiry remains, where did the grantor in this deed, given in 1865, get title to the shore? Conceding that it includes the three acres conveyed by Henry Cock to Thomas Jones, I have already reached the result that such deed did not include the land in question, although the deed from Prindle to Daniel Cock undertook to convey such three acres to the Sound. But what happened after 1865? By several conveyances employing substantially the same description as

the deed of 1865, the land came, on February 20, 1884, to Christian Firling, whose heirs in 1909 conveyed to the defendant, by courses and distances, what is said to be the uplands and meadows in the deed of 1865, and also the entire beach to Fox Island. Defendant exercised the acts of ownership on the beach which resulted in this action. But meantime the plaintiff had asserted its rights and possession to the beach by leasing Oak Neck Beach with certain reservations, in 1886, for 25 years to Kimber. Charles Christian Firling was one of the grantors to defendant, and the son of Christian Firling, and lived on the property fom 1873 to May, 1912. He testified:

"Under the description of my deed that I sold to Mr. Stehli I have not claimed Fox Island. I claim down to this causeway. Between the line which is indicated as running north from the causeway and Fox Island I make no claim to the beach. I never have made any."

But that claim to the causeway is wide enough to include whatever of the land in dispute is described in the deed of 1685, which, as regards the land in question, rests on no grant from the sovereign, or any person in possession. In any case, that grant did not include all of the locus in quo, as Plaintiff's Exhibit 4 and Defendant's Exhibit B show. The question of title by adverse possession is not here for consideration.

The judgment should be reversed, and a new trial granted; costs to abide the event. All concur.