Mario Pittoni, J.
The plaintiff has brought this action pursuant to section 51 of the General Municipal Law as a taxpayer, and he makes claim on behalf of the Town of Oyster Bay for damages allegedly sustained by Oyster Bay by reason of an alleged trespass committed by defendant United States Dredging Corporation under a contract with defendant Town of Huntington in dredging the underwater lands of Cold Spring Harbor and the removal therefrom of sand, gravel and other materials. The plaintiff claims that all this land belonged to Oyster Bay, not Huntington.
An order of this court dated January 19, 1962 directed that “ the issues of liability of the defendants, United States Dredging Corporation, Town of Oyster Bay and the Town Board of Oyster Bay, be separately tried prior to the trial of other issues in this case ”, and the trial of these issues, as so directed, has taken place before me.
This is another controversy in a long series of litigations involving the true meaning and proper construction of ancient colonial charters relating to title to underwater lands on Long Island, and in this litigation the rights of the parties depend upon the title to the underwater land in the southerly part of the bay known as Cold Spring Harbor (hereinafter called the Harbor). The Harbor is a body of water on the north shore of Long Island between the Towns of Oyster Bay, Nassau County, and Huntington, Suffolk County, and is connected with and permeated by the wafers of the Long Island Sound.
We are now faced with four or five different claims to the same underwater land in the southerly part of the Harbor. The *448 Town of Oyster Bay claims the underwater land easterly all the way over to the high-water mark of the east bank, or Huntington side. The Town of Huntington, on the other hand, claims all the underwater land westerly all the way over to the west bank, or Oyster Bay side. Another defendant, the United States Dredging Corporation, claims that the underwater land belongs to private owners. Other claimants have been mentioned, but they have no standing in this action and their contentions are not discussed.
I shall consider later in this opinion, after I have analyzed the substantive issues, whether the plaintiff was authorized to bring this action, for until those issues have been determined, I cannot properly pass upon and decide the plaintiff’s right to bring this action.
As the Town of Huntington properly points out, before the plaintiff can sue and succeed he must do so on the strength of Oyster Bay’s title and not on the weakness of Huntington’s. He must affirmatively establish in this action that title to the lands involved belong to Oyster Bay.
The contention of the United States Dredging Corporation will be considered first. It contends that title to these underwater lands belongs to private owners as successors to the rights and titles of old or ancient proprietors (Exhibit E). The first deed in the chain put forth by the dredging company is one dated February 28, 1712 from the Trustees of Oyster Bay to Daniel Ireland, but this deed granted title only for uplands. Thus there never was any grant by the Town of Oyster Bay or its predecessors of any underwater lands of the Harbor to those mentioned in Exhibit E. Nor is there any presumption, permissible inference or any other allowable conclusion from any deeds in evidence placing title to these underwater lands to private owners, for in the absence of language clearly indicative of any different intent, grants of land by municipalities or other governmental bodies, where the lands are bounded by navigable waters or by waters whose tides ebb and flow, carry title only to the high-water mark (Tiffany v. Town of Oyster Bay, 209 N. Y. 1, 9; Matter of Mayor of the City of N. Y. [Riverside Park], 182 N. Y. 361, 365). In Matter of Mayor of the City of N. Y., the court stated as follows: ‘ ‘ The rights of the sovereign, whether crown or state, to land under water in navigable streams and arms of the sea are doubtless twofold, proprietary and governmental. As proprietor, the sovereign may sell or convey to others, but as to the power to govern, the sovereign holds as trustee for the use of the public, under such laws, rules and regulations as *449 may from time to time be adopted and which shall be deemed to best serve the interests of commerce and the state. These powers may be transferred by the sovereign to local subordinate governments which have been established, constituting such governments the trustees of the public and the guardians of the rights and privileges of the people. * * * While the king had the power to convey the tideway on the shores of the high seas and navigable rivers, he will not be presumed to have done so by merely bounding the conveyance upon the sea or the river; such conveyance will carry title only to high-water mark. Other words must be employed in the conveyance which would clearly indicate his purpose and intent to convey the lands under water in order to pass the title thereto. (Trustees of Brookhaven v. Strong, 60 N. Y. 56; Sage v. Mayor etc. of N. Y., 154 N. Y. 61; Mayor etc. of N. Y. v. Hart, 95 N. Y. 443.) ”
Clearly, therefore, the dredging company has failed to establish that these underwater lands belong to private owners.
Huntington claims title to all the underwater land of the inner Harbor. It argues in part that it has title by the exercise of its propriety rights over the area and cites Knapp v. Fasbender (1 N Y 2d 212) and Robins v. Ackerly (91 N. Y. 98) in support of its contention. However, these cases do not help Huntington because the Fasbender case (p. 217) merely passed upon the constitutionality of a Huntington Town Board resolution which included a contract 1 ‘ for the dredging of Huntington’s harbors and bays ”, and the Robins case (pp. 100-101) involved “ the right of the plaintiff to the use of land under water in Northport Harbor * * * for the purposes of an oyster bed.” These cases clearly fail to establish, factually or in legal principle, the position for which they are cited. Furthermore, in at least one instance, Huntington, in litigation brought against it by the Village of Lloyd Harbor, disclaimed jurisdiction over certain lands located on the eastern shore of the Harbor, but north of the present contested area, on the ground that this area was in the jurisdiction of Oyster Bay (see Matter of Jennings v. Watt, 264 N. Y. 306, 309, 310). Be that as it may, Oyster Bay, over a century ago, claimed propriety rights to this same underwater land (see Rogers v. Jones, 1 Wend. 237) and did so again at the turn of the century against a purported grant by the State of New York (see Tiffany v. Town of Oyster Bay, 209 N. Y. 1). So where are we on these conflicting claims? Surely we do not have any sufficient foundation for title in Huntington by any adverse claim or possession. Even if Huntington were able to raise a presumption of title by long duration of adverse possession, that presumption would *450 be rebuttable and would vanish when overcome by evidence or authority establishing actual title in someone else (Town of Oyster Bay v. Stehli, 169 App. Div. 257 [2d Dept.]; Price v. Brown, 101 N. Y. 669).
Any claim by Huntington to these underwater lands by reason of any early grants, conveyances, charters or patents must also fail. Nearly all the Long Island towns, including the Town of Huntington, were created by royal charters, and the patents were intended not only to create the corporate bodies but also to convey title to the land within the bounds of the town. So origin of the title to the property must be traced to the grant by the Crown to the Duke of York and the royal charters and patents issued by the Duke’s governors (Trustees of Town of Southampton v. Mecox Bay Oyster Co., 116 N. Y, 1). The Duke of York’s conveyance or grant to Huntington in 1666, 1688 and 1694 of the Huntington west boundary was fixed as “from a Oertaine River or Creelce on the west' — commonly called by the Indyans by the name of Nechaqustaek and by the English the Cold Spring ”. Thus Huntington received lands only up to the east bank of the Harbor at high-water mark and, nothing else being said in the grants, no underwater land west thereof (Matter of Mayor of City of N. Y. [Riverside Park], 182 N. Y. 361, supra; Sage v. Mayor of City of N. Y., 154 N. Y, 61).
Although the Huntington brief appears to have discarded any claim of title through Indians, Huntington did spend a great deal of time during the trial to establish its title through Indians by introducing many historical books and by the testimony of Roy Lott, the Town of Huntington Historian. Among other things, Mr, Lott described how the land was deeded by the Indians, in some cases several times, for coats, kettles and similar articles, and later for “wampum”. I do believe Huntington was sincere in offering this evidence and was not motivated by a mere desire to entertain me in this serious and difficult case with pleasant and interesting irrelevancies. Be that as it may, this contention is answered by an interesting and pertinent quotation from Town of Southampton v. Mecox Bay Oyster Co. (116 N. Y. 1, 7, supra) as follows:
“ Nor did the Indians have any title to the land which they could grant, and which would be recognized in the courts of this country. The English possession in this country rested upon the right of discovery, and the lands were held by the king as the representative of the nation. This subject has been learnedly discussed by Chief Justice Mabshaul in Johnson v. M’Intosh (8 Wheat. 543), and by Chief Justice Tauey in Martin *451 v. Waddell (16 Peters, 367), and in these cases the Supreme Court of the United States said: 1 If discovery be made and possession be taken under the authority of an existing government, which is acknowledged by the emigrants, it is supposed to be well settled that the discovery is made for the benefit of the whole nation, and the vacant soil is to be disposed of by that organ of the government which has the constitutional power to dispose of the national domain.
“ 1 The Indian tribes in the new world were regarded as mere temporary occupants of the soil, and the absolute rights of property and dominion were held to belong to the nation by which any particular portion of the country was first discovered. Whatever forbearance may have been sometimes practiced toward the unfortunate aborigines, either from humanity or policy, yet the territory they occupied was disposed of by the governments of Europe at their pleasure, as if it had been found without inhabitants.’ ”
Huntington, too, has failed to establish its contention, that these underwater lands belong to it.
Having disposed of the claims by the dredging corporation and by Huntington, I shall now consider the affirmative proof of title offered on behalf of Oyster Bay.
It is unnecessary to consider historical or other evidentiary matter submitted herein because at least two New York Court of Appeals decisions have made such considerations futile. Huntington argues to the contrary, that it was not a party to Tiffany v. Town of Oyster Bay (209 N. Y. 1) and that the decision in that case, therefore, could not deprive it of Huntington territory. It also contends that the New York Court of Appeals erred in Rogers v. Jones (1 Wend. 237, supra) and in Tiffany v. Oyster Bay, because certain historical facts were not brought to that court’s attention. However, the trial court is bound by the decisions of the New York Court of Appeals. Then, too, Huntington did not bring into the present case any historical facts that would change my opinion as to the court’s holding in the Tiffany case. If that high court erred in those two cases, only that court may say so. Furthermore, even though the decisions of these two cases are not specifically binding on Huntington, these decisions, especially the Tiffany case, are not factual decisions in the usual sense, but judicial interpretations of language in the specific charter in issue, that is, the Andros patent. The court, in interpreting that patent and in declaring title to be in Oyster Bay (Tiffany v. Town of Oyster Bay, supra, pp. 8, 9, 11), stated as follows:
*452 ‘ ‘ And finally we have in the third place a general description of the entire tract conveyed as 1 Bounded on the North by the Sound, on the East by Huntington Limmitts, on the South Part by the Sea and part by Hempstead Limmitts and on the West by the Bounds of Hempstead aforesaid; including all the Necks of Land and Islands within the aforesad described Bounds and Limmitts.’
‘ ‘ Here we have a certain river or creek, called by the English the Cold Spring, given as the western boundary of Huntington. Clearly this creek formed part of the ‘ Huntington Limmitts ’ mentioned in the Andros patent to Oyster Bay eleven years later. The Huntington patent, however, conveyed no part of such creek to the town of Huntington beyond high-water mark. In the absence of language clearly indicating a different intent, grants of land bounded by the sea or a navigable river where the tide ebbs and flows carry the title only to high-water mark. (Sage v. Mayor, etc., of N. Y., 154 N. Y. 61; Matter of Mayor, etc., of New York, 182 N. Y. 361.) So that Huntington acquired no part of the land under water in Cold Spring Harbor by virtue of its patent prior to the Andros patent to Oyster Bay unless it can be held that title thereto was conveyed under the clause which embraces in the grant ‘ also all Havens, Harbor, Creekes, ’ etc. This clause, however, is qualified by the requirement that such havens, harbors and creeks must be ‘ within limits and bounds aforementioned; ’ and, inasmuch as the western limit was high-water mark along the eastern shore of Cold Spring Harbor, the harbor itself cannot be deemed to be ‘ within the limits and bounds afore-mentioned, ’ but on the contrary is clearly outside of them.
‘ ‘ The result of this discussion is the conclusion that the whole of the land under water in Cold Spring Harbor and the bay known as Oyster Bay was granted to the town of Oyster Bay by the Andros patent of 1677.”
Bound by these decisions, I find that Oyster Bay owned the underwater land in issue all the way east to the high-water mark on the Huntington side.
In their briefs, both Oyster Bay and Huntington disclaim the jurisdictional boundary line established by the State Engineer in 1860 and 1875 as their title line even though Huntington accepted it on the motion for summary judgment heard previously in this case and even though in Matter of Jennings v. Watt (264 N. Y. 306, 315) the Court of Appeals intimated that the State Engineer’s jurisdictional line .should be the title line between these two municipalities. To me, it is inconceivable that Oyster Bay should have jurisdiction only to the line deter *453 mined by the State Engineer, and affirmed in the J ennings case, and at the same time have title to underwater land which is farther east and subject to the jurisdiction of Huntington. We are not dealing with ordinary out-of-water lands or uplands, but land under navigable water. It would seem reasonable that the title and jurisdictional lines of these underwater lands claimed by these two municipalities should coincide. But on the evidence and the law presented to me, it is unmistakable; Oyster Bay’s title goes to the high-water mark on the Huntington side, and as will be shown (infra), whether we take the Tiffa/ny line or the Jennings line, the dredging corporation did commit acts of trespass on Oyster Bay property.
Let us now consider the question of trespass by the dredging corporation. It has been established beyond dispute that the corporation was operating in the inner harbor of Cold Spring Harbor, west of the title line established in the Tiffany case and also west of the jurisdictional line approved in the Jennings case. The dredging corporation invaded Oyster Bay underwater lands and took Oyster Bay materials; and its invasion, dredging and taking were all accomplished with intent to do so, as established by the circumstances surrounding its acts and by its very contract with Huntington to dredge and take in that area. Trespass by the dredging corporation has thus been established, and thfl mftrfl fact that its nnt nnIajyE-VI or that its actions in Oyster Bay property were due to mistake or inadvertence is no defense (Phillips v. Sun Oil Co., 307 N. Y. 328, 331; Wood v. United Air Lines, 32 Misc 2d 955, affd. 16 A D 2d 659; MacDonald v. Parama, Inc., 15 A D 2d 797). However, if the plaintiff is claiming treble damages, which is not found in the complaint but is argued in the brief, the basis for this claim has not been established. Even if the evidence established that the dredging corporation was careless or wanton in its search or failure to search for the true boundary lines, it cannot be said that its actions were with unlawful or criminal intent. Therefore, it could not be liable for treble damages (MacDonald v. Parama, Inc.).
Now we shall consider the defendants’ contention that the plaintiff could not properly bring this taxpayer’s suit under section 51 of the General Municipal Law. That statute states in part as follows: 11 All officers # * * acting * * * for * * * any * * * town * * * may be prosecuted, and an action may be maintained against them to prevent any illegal official act * * * or to prevent waste or injury to, or to restore and make good, any property * * * of such * * * town * * * by any person * * * whose *454 assessment # * * shall amount to one thousand dollars, and who shall be liable to pay taxes on such assessment in the * * * town * * * to prevent the waste or injury of whose property the action is brought * * *. Such person * * * shall furnish a bond * * * to be approved by a justice of the supreme court * * * [A]ny right of action now existing, or which may hereafter exist in favor of any * * * town * * * may be enforced by action * * * by the persons hereinbefore authorized to prosecute and maintain actions ’ ’.
The plaintiff has satisfied the technical part of his qualifications by showing that he is a taxpayer in the Town of Oyster Bay with an assessment of his property of over $1,000, and he has duly filed a bond which has been approved by a Justice of the Supreme Court. Furthermore, as has been established above, the property involved belonged to the Town of Oyster Bay. We shall now proceed to consider the other basic factors necessary for bringing the action.
Oyster Bay officials could have been more careful and zealous in protecting Oyster Bay property. During the early part of the dredging corporation’s activities there was an objection made by an Oyster Bay Deputy Town Attorney that the dredging would invade Oyster Bay property, but after that Oyster Bay officials did nothing further to protect the rights and property of Oyster Bay even though the dredging was going On in Oyster Bay property in the clear sight of anyone who looked, and even though the Tiffany and Jennings decisions were matters of common knowledge. In fact, the Tiffany case was instituted by Oyster Bay itself and was based upon a patent which was on file and available for examination by anyone who searched. Thus we have either a willful or a careless abandonment of town assets; and the later contract of August 11, 1959 between Oyster Bay and the dredging corporation and the board resolution approving this contract for future dredging operations did not provide for payment for property already taken, but for future operations in a delineated area on the map attached to the contract and marked “ Dredging area.” They did not cover all the Oyster Bay property involved in this suit, nor did they provide for payment for the gravel and sand taken from Oyster Bay property, as shown, for example, on the Baldwin and Cornelius soundings map. This contract was later abandoned. Thus at the time the action was started in the Fall of 1959, when the plaintiff’s qualifications under section 51 of the General Municipal Law were determinable, Oyster Bay officials had done little to recoup Oyster Bay money, and did not *455 adopt some solid plan for payment for property previously taken until March and April, 1960, long after this action was started when, by resolution, Oyster Bay officials accepted a sum of money for gravel taken west of a jurisidictional line in the harbor. But even this belated attempt failed to provide for payment for other material, such as sand, taken from that area, or for any material, including gravel, taken from the area east of the jurisdictional line and up to the Tiffany line. Be that as it may, as of the date of this lawsuit, Oyster Bay officials had done little but approve the August 11, 1959 contract for future dredging in an area different from the area unlawfully invaded by the dredging corporation, and this contract was later abandoned. So, to the extent that Oyster Bay officials in their bargaining with the dredging corporation did nothing to recoup Oyster Bay money or provided for less payment to Oyster Bay than the actual value of all the property taken, it was a donation to the dredging corporation in violation of the State Constitution (N. Y, Const., art. VIII, §§ 1 and 10; Matter of Boyd v. Collins, 11 N Y 2d 228, 231, 234; New York Tel. Co. v. Board of Educ. of City of Elmira, 270 N. Y. 111, 119; Matter of Schulster v. Carney, 196 Misc. 356, affd. 276 App. Div. 592). It follows that this action to recover the property wrongfully taken, or its value, is a proper one under section 51 of the General Municipal Law, and the inclusion of the Town of Oyster Bay, the Town Board and its board members as defendants is proper (General Municipal Law, § 51; Wenk v. City of New York, 171 N. Y. 607; Eames v. Kellar, 102 App. Div. 207).
Other contentions have been considered. They have been disposed of by the discussion (supra), or lacked sufficient merit for verbal analysis.
It follows that:
The underwater land in issue belongs to the Town of Oyster Bay all the way over to the Tiffany line, or more specifically, to the high-water- mark on the Huntington side;
The United States Dredging Corporation did commit trespass on Oyster Bay land and did take materials therefrom, and is therefore liable to the Town of Oyster Bay; and
This action, instituted in October, 1959, has been properly brought by a qualified taxpayer pursuant to section 51 of the General Municipal Law.