JOHN E. CANFIELD, Plaintiff, *v.* ROBERT W. QUAYLE and CHARLES E. BAXTER, Trading under the Firm Name and Style of RICHMOND BILLIARD AND BOWLING CLUB, Defendants.

Supreme Court, Herkimer County, February 27, 1939.

*James P. O'Donnell*, for the plaintiff.

*William D. Bresinhan* [*Warnick J. Kernan* of counsel], for the defendants.

ZOLLER, J. Plaintiff is the owner in fee and the occupant of certain real property in the village of Herkimer consisting of the dwelling and premises known as 115 Green street. This property is located on the northerly side of the street. Green street is within what has been designated and defined in the village of Herkimer as a business district. The street runs generally easterly and westerly and on the west intersects North Main street near the business center of the village. Plaintiff lives in the first block east of Main street, which is a comparatively short block, being about 428 feet in length. The paved surface of the street in this block is about forty-four feet in width.

Plaintiff is one of the leading and most successful physicians and surgeons of the village and county of Herkimer. For many years he has had and continues to have a very large and extensive practice. He has lived within the premises in question for nearly thirty years, part of which is used for offices in connection with the practice of his profession. Plaintiff paid a substantial purchase price for the property at the time he bought it and has since expended a considerable amount of money for repairs and many improvements thereto. The location of this property is exceptionally good for the purposes for which it is occupied and used.

The defendants are lessees of a two-story brick building, formerly owned by the Herkimer Lodge of the Independent Order of Odd Fellows. They took possession in June, 1937. The building is commonly known as the " Odd Fellows Temple," and it is about ninety feet in length and forty-five feet in width and is located on the southerly side of Green street in a southwesterly diagonal direction from plaintiff's home. Defendants conduct and operate therein public bowling alleys. While the temple was owned and used by the Odd Fellows from in or about 1918 to in or about 1930, there were two bowling alleys in the basement of the building. This basement is below the ground level and in addition to the two bowling alleys, which are still maintained and used, contains the boiler room and other space for use in connection therewith.

When defendants entered into a lease of the premises in June, 1937, for five years beginning September first, at a monthly rental of $100, they installed on the second or top floor four bowling alleys, built in part of new material and in part of some bowling alleys which they had owned and operated for several years prior thereto in the basement of what is known as the Richmond Theatre Building on the westerly side of North Main street, some three or four blocks away. In order to adapt the second floor for this purpose it was necessary to remove some partitions which had divided the second floor of the building into a lodge room and other smaller rooms, when it was used by the Odd Fellows. All of this work, including the installation of the new bowling alleys on the second floor, was done in the summer of 1937. These four bowling alleys are of modern and approved construction. There is no claim made that these alleys are improperly constructed or that there is any undue or unnecessary noise in their operation by reason of such improper or faulty construction. Plaintiff, however, does claim that the maintaining of these bowling alleys, that is the four alleys on the second floor, constitutes a nuisance and that their use late at night and early in the morning, including Sunday mornings, creates and causes great noise and disturbance

which materially impair plaintiff's enjoyment of his home. Accordingly, he has brought this action and demands judgment " that said nuisance be removed; that the defendants be enjoined from using said building as a bowling alley, except in the basement thereof where the bowling alley was formerly located, and be enjoined from operating said bowling alley at unreasonable hours of the night and early morning and on Sundays, and that the plaintiff recover of defendants the sum of Two Hundred Fifty Dollars ($250) damages and costs of this action." Upon the trial, however, it was stipulated in open court by plaintiff's counsel that no money damages were to be proven or demanded and that the plaintiff asked only that the nuisance be permanently abated and removed.

A bowling alley is not a nuisance *per se*. (*Pape* v. *Pratt Institute*, 127 App. Div. 147.) Certainly there is nothing unlawful in connection with the maintenance and operation of such a business and, surely, such a business in itself is not to be considered or classified as dangerous or a menace to the public. Plaintiff, however, contends that he has established sufficient facts to successfully show that defendants are maintaining a nuisance upon or within the property leased.

If the danger or damage threatens the public the nuisance is classified as common; if it threatens one person or a few it is then called a private nuisance. Here, plaintiff says and has offered his testimony in proof and support thereof that a private nuisance exists by reason of defendants' maintenance and operation of four bowling alleys on the second floor of the so-called Odd Fellows Temple on the southerly side of Green street and within the business district of the village of Herkimer.

As stated many years ago by Judge ANDREWS of the Court of Appeals in *Booth* v. *R., W. & O. T. R. R. Co.* (140 N. Y. 267, 277): " Whether a particular act or thing constitutes a nuisance may depend on the circumstances and surroundings. * * * The test of the permissible use of one's own land is not whether the use or the act causes injury to his neighbor's property, or that the injury was the natural consequence, or that the act is in the nature of a nuisance, but the inquiry is, was the act or use a reasonable exercise of the dominion which the owner of the property has by virtue of his ownership over his property, having regard to all interests affected, his own and those of his neighbors, and having in view also public policy."

Judge VANN, writing for the Court of Appeals in *McCarty* v. *Natural Carbonic Gas Co.* (189 N. Y. 40, 46), said: " The law relating to private nuisances is a law of degree and usually turns on the question of fact whether the use is reasonable or not under all the

circumstances. No hard and fast rule controls the subject, for a use that is reasonable under one set of facts would be unreasonable under another. Whether the use of property to carry on a lawful business, which creates smoke or noxious gases in excessive quantities, amounts to a nuisance depends on the facts of each particular case. * * * Location, priority of occupation and the fact that the injury is only occasional are not conclusive, but are to be considered in connection with all the evidence and the inference drawn from all the facts proved whether the controlling fact exists that the use is unreasonable. If that fact is found, a nuisance is established and the plaintiff is entitled to relief in some form. Unless that fact is found, or it is an inference at law from other facts found, no nuisance is established, even if the plaintiff shows that he has suffered some damage, annoyance and injury. * * * Whether the use of property by one person is reasonable, with reference to the comfortable enjoyment of his own property by another, generally depends upon many and varied facts; such as location, nature of the use, character of the neighborhood, extent and frequency of the injury, the effect on the enjoyment of life, health and property and the like."

In a much older case, *Campbell* v. *Seaman* (63 N. Y. 568), Judge EARL, writing the opinion, said (at pp. 576, 577):

" It is a general rule that every person may exercise exclusive dominion over his own property, and subject it to such uses as will best subserve his private interests. Generally, no other person can say how he shall use or what he shall do with his property. But this general right of property has its exceptions and qualifications. *Sic utere tuo ut alienum non lædas* is an old maxim which has a broad application. It does not mean that one must never use his own so as to do any injury to his neighbor or his property. Such a rule could not be enforced in civilized society. Persons living in organized communities must suffer some damage, annoyance and inconvenience from each other. For these they are compensated by all the advantages of civilized society. If one lives in the city he must expect to suffer the dirt, smoke, noisome odors, noise and confusion incident to city life. * * *

" But every person is bound to make a reasonable use of his property so as to occasion no unnecessary damage or annoyance to his neighbor. If he make an unreasonable, unwarrantable or unlawful use of it, so as to produce material annoyance, inconvenience, discomfort or hurt to his neighbor, he will be guilty of a nuisance to his neighbor. And the law will hold him responsible for the consequent damage. As to what is a reasonable use of one's own property cannot be defined by any certain general rules,

but must depend upon the circumstances of each case. A use of property in one locality and under some circumstances may be lawful and reasonable, which, under other circumstances, would be unlawful, unreasonable and a nuisance. To constitute a nuisance, the use must be such as to produce a tangible and appreciable injury to neighboring property, or such as to render its enjoyment specially uncomfortable or inconvenient."

Plaintiff to succeed here must prove not only that the use made of the Odd Fellows Temple by defendants is unreasonable, but also that he, the plaintiff, has sustained material and substantial damage. If the use is reasonable there can be no private nuisance, and unless plaintiff's injury is material and actual and not fanciful or sentimental, this court of equity will not interfere with defendants' use of the property. These facts plaintiff must establish by a fair preponderance of proof. " The injury or annoyance which will warrant relief against an alleged nuisance must be of a real and substantial character, disturbing comfort or impairing enjoyment of property; for if the injury or inconvenience be merely theoretical, or if it be slight or trivial, or fanciful, or one of mere delicacy or fastidiousness, there is no nuisance in a legal sense." (46 C. J. 676.)

The question, therefore, to be determined here is whether or not plaintiff upon all the facts and proof of this particular case has sustained the burden of proof in showing that defendants are guilty of maintaining a nuisance under all the circumstances, that is, that the use which they make of the so-called Odd Fellows Temple is unreasonable and that because of such use he suffers some unnecessary damage or annoyance which is material and specially injurious.

In support of his cause of action, plaintiff testified that when the Odd Fellows were occupying and enjoying their property he did not hear much noise due to the use of the two bowling alleys located in the basement of the temple. However, plaintiff said conditions were different after defendants had taken possession of the property. The first disturbance was on Sunday, August fourteenth. As to that he testifies as follows: " The first really uncomfortable day that I had was August 14th from morning all the way through. There was a continuous roar like a saw-mill over in there. I complained to the police and they said it wasn't in their power to stop it. * * * It [the noise] came from the second story of the Odd Fellows Temple. Then about 6:30 I complained again to the police and they sent someone over and in about an hour after that the noise stopped."

It appears that the noise which was created on this particular day was due to work which was being done on the alleys preparatory

to opening them for the fall business, and that they were not actually opened to the public until later, as the alleys were not used during the months of June, July and August, due to the fact that bowling, in this vicinity at least, is not indulged in during the summer months. Plaintiff did not occupy his home from around the middle of August, 1937, to the last of May, 1938, because during that time he was away from the village of Herkimer on account of the condition of his health. However, the property was occupied by another physician who it seems had made complaints to the plaintiff with respect to the noise and disturbance which he claimed came from the bowling alleys. In response to the complaints received from his tenant, plaintiff caused a petition to be filed with the village board and had his lawyer enter a complaint against the operation of the alleys during the winter of 1937–38.

It is not urged by counsel for the plaintiff that this court should take much notice of the complaint regarding the noise which apparently did occur within the premises on Sunday, August fourteenth, because counsel recognizes that such a disturbance was temporary in nature and due to the sanding of the alleys or runways in preparing the alleys for use. There was no explanation given by the defendants of the reason for doing this work on Sunday. It does seem to the court that it might have been done, and should have been done, on some other day. In any event, plaintiff further testified that he was not disturbed by any noise to any extent following August fourteenth until the fifteenth of September, when, he said, " I was disturbed violently," and it was impossible for him to sleep, the noise having started around three o'clock in the afternoon and having continued until nearly three o'clock the following morning.

Generalizing the noise and disturbance complained of at this time and on several later occasions, plaintiff described it as follows: " It would first consist of a roar, then a heavy ball or body striking something. Then you will hear pins, I presume they are, rattling in all directions. Then there will be a cheer leader applause and then after the bowling is over the congregation assembles outside. There is cheering, talking and quite a mass meeting before it breaks up." This, he said, occurred on the afternoon of September seventeenth, which was Saturday, and the noise and disturbance continued until three-fifteen o'clock the following Sunday morning. Again, on the twenty-fifth of September, which was Sunday, he said he was disturbed and kept awake all night and until early that morning, the bowling having started around four o'clock Saturday afternoon and having continued until three o'clock Sunday morning.

Plaintiff brought his action on September sixth, his complaint having been verified on August twenty-fifth. The testimony which he gave as to disturbances claimed to have occurred after the commencement of his action was not objected to and was received in evidence. Apparently the only serious disturbance which had occurred prior to the preparation and verification of his complaint was that on Sunday, August fourteenth, when, as stated, the alleys were being put in readiness for use. The plaintiff further testified that since September " the noise has continued right along every night and every afternoon, Sundays included," and in answer to counsel's question if it had lessened somewhat during the week before the trial, which was held on Thursday, December 22, 1938, plaintiff said, " Yes, last Sunday, or last Saturday, they started at five o'clock in the evening and stopped at 1:30 Sunday morning. The greatest disturbance then was along about one o'clock when I imagine the people began to go home. Since last Sunday there has not been very much activity there. I have had a couple peaceful nights."

It is fair and reasonable, it seems to me, to conclude from Dr. Canfield's own testimony that he has been disturbed and annoyed particularly by the loud talking and laughter of the various participants in the games as they have left the building in the early hours of the morning and not so much by the noise of the bowling balls along and over the alleys and the noise that followed the contact or collision between the bowling balls and the pins at the lower end of the alleys. The alleys are about sixty feet in length from the foul line to the head pin, and extend in a generally northerly and southerly direction, with the player at the northerly end toward the front of the building and with the pit at the southerly end at the rear of the building. The balls are hard rubber and weigh around sixteen pounds. The pins are wood and weigh around three pounds. Wooden pins seem to be the kind generally used. Evidently it has not been deemed advisable by promoters of this sport to substitute hard rubber pins for wooden ones. If that were done, possibly there would be less noise at the crash of the pins. The alleys are constructed of maple and pine and each pit has a wooden base with a rubber cushion and the back of each pit is cushioned with leather, the purpose of the rubber cushion and the leather cushion being to deaden the sound when the ball and the pins come in contact. The pins on the second floor, and this is where it is claimed the noise comes from, are set by hand and not by mechanism, the operation of which oftentimes makes considerable noise in itself.

Plaintiff called four of his neighbors to testify in his behalf, one of whom lives on the second floor, at the front, of a block on

the northerly side of Green street, at about the same distance from the Odd Fellows Temple in a northwesterly direction as the plaintiff's home is located in a northeasterly direction. The other three witnesses live farther away, on Washington street, which crosses Green street east of plaintiff's home and the property in question. All four witnesses had some complaint to make regarding the noise which they said came from the Odd Fellows Temple while bowling was in progress during various hours of the evening and early morning. It seems to me that none of the testimony given by these four witnesses was either forceful or convincing. To be sure they had infrequently heard sounds common to bowling and had been on a few occasions somewhat disturbed. A fifth witness for the plaintiff was a justice of the peace of the town of Herkimer, who upon several occasions during the time here under consideration had held court on the second floor of the Municipal Building which adjoins the Odd Fellows Temple on the east. He was asked, " Will you describe what you then heard during those trials? " and replied, " It was a noise caused by this bowling place, the balls striking the pins in the alleys next door. It was particularly noticeable when I had to have the windows in the courtroom opened during the warm weather." Then when asked if the noise disturbed the trials, his anwer was: " To a certain extent, yes." It appears that the courtroom in the Municipal Building is at the northwest corner, which is the nearest corner to the Odd Fellows Temple.

About all that may be said of the testimony of this witness is that on some occasions during the warm weather, when the windows of the courtroom were open, some noise, including laughter, cheering and applause came from the bowling alleys into the courtroom, but never of such volume as to disturb the court, or interrupt its deliberations. On the cross-examination of this witness it was developed that he was referring to conditions which existed prior to certain changes made by the defendants in the spring of 1938, whereby the windows on the second floor of the temple were covered with celotex.

My conclusion is that the testimony of this witness likewise has little probative value.

The proof shows that on the north side of the building in question, on the second floor, there are two large openings, each consisting of three window frames, the openings being eight feet six inches in length and five feet five inches in height, and that in addition to these there are other smaller openings of varying dimensions, and on the east side, which is the side towards plaintiff's home, at the front there are a large opening five feet in width and about

five and one-half feet in height and farther south four small openings about two feet square. There are four windows at the south end of the building on the second floor. No mention was made of the number of windows, if any, on the westerly side.

It was further established upon the trial that after defendants had received some complaint regarding the noise of the alleys, and early in 1938, they had the large front window frames and the four back window frames fitted with celotex, the celotex being placed next to the glass on the inside so as to completely cover the whole of each window. When the celotex is in place the windows cannot be opened, but it was the practice after its installation to remove the celotex from the upper portion of some of the windows in warm weather and to lower some of these upper windows for ventilation purposes, and then at eleven o'clock P. M., whenever this procedure was followed, to close the upper windows and replace or restore the celotex. Some windows, however, on the second floor were never opened.

Plaintiff's home is the only private residence on Green street in the block between North Main and Washington streets. Almost directly across from plaintiff's property is the Municipal Building, in which are located various municipal offices, including the office of the chief of police and that of the police justice and his courtroom. At the rear and as a part of this same building is the village lock-up, entrance to which is on the westerly side of the building. The easterly wing of the Municipal Building houses the fire department, the fire fighting apparatus of which consists of two pumpers, triple combinations, city service truck and the chief's car, all of which equipment is kept on the first floor of the wing. Sleeping quarters for the firemen are overhead and from six to ten firemen sleep there regularly. When there is a box alarm all of this fire fighting apparatus goes out and, as stated by the fire chief, when all this apparatus responds to a box alarm there is quite a little noise. At one time and over a period of years, an ambulance was kept in the rear of the Municipal Building. This was the only ambulance maintained in the village and was often used and called out at various hours of the day and night. It was equipped with a siren. This building has been used for municipal purposes, much in the same manner as at present, ever since it was built in 1906.

East of the Municipal Building and on the southwest corner of Green and North Washington streets, is the Baptist church, of brick construction, which fronts on North Washington street. At the southeast corner of Green and North Main streets is the First National Bank Building, facing Main street and extending back a considerable distance along Green street. This is a bank

and office building, with the entrance to the offices on Green street. The Odd Fellows Temple separates the Municipal Building on the east from the bank building on the west. These four buildings are the only buildings on the southerly side of Green street in this particular block.

On the northerly side of Green street, between North Main and North Washington streets, the various buildings and premises, starting with Main street on the west, are the following: At the northeast corner of North Main and Green streets is what is known as the Central New York Power Corporation Building. It was formerly owned and occupied by the First National Bank and is of substantial construction, with offices on the second floor and with the entrance thereto toward the rear of the building on Green street. Next easterly is the Pellenz Block with two ground floor stores and with apartments on the second and third floors. The local reporters for the Utica *Press* and the Utica *Observer-Dispatch* now have their offices in one of these stores. The next building on the east is a wooden structure formerly owned and occupied by its owner as a tailor shop. It is now occupied by a real estate agency. Adjoining this one-story wooden building on the east is a large brick building two or three stories high, which is used by the owners and publishers of the Herkimer *Evening Telegram* and which contains very modern and complete printing equipment, all of which when in operation each week-day is bound to make, and the court takes judicial notice of the fact that it does make, considerable necessary noise. This building and this large printing plant adjoin plaintiff's residence on the west, and next east of his residence, at the northwesterly corner of Green and North Washington streets, is property now owned by an oil and gasoline company, which conducts thereon a gas station and leases part of the building to an insurance agent who has his office therein. On this property there was for many years a grain and feed store, which recently was removed and replaced by the present gas station with its building and pumps and other equipment.

From the foregoing description of the buildings on both sides of Green street in this block between North Main and North Washington streets and of their size and type of construction and the purposes for which they are used, it must be conceded that this particular portion of Green street is definitely a business section of the village and not a residential zone, and has been for many years, because the proof further shows that prior to the construction of the Odd Fellows Temple and also of the bank building next westerly, there had been on the corner where the bank building now stands a business and office block and on the

site of the present Odd Fellows Temple a brick building known as the Grange Block, two or three stories high, and that the Herkimer County Grangers' Exchange conducted a grange store on the first floor and on the second floor there was a hall where dances were frequently held. Both the Grange Block and the business block on the corner were destroyed by fire in 1917, and soon afterwards the Odd Fellows Temple and the present bank building were built.

Among the witnesses sworn for the defendants were a former acting mayor of the village of Herkimer and the present chief of the village fire department, both of whom testified that they had never heard any cheering or disturbance on the street outside the building in question since the defendants had conducted therein the bowling alleys now complained of. Both of these witnesses had spent considerable time in the Municipal Building, the acting mayor in the discharge of his official duties and the fire chief as head of the fire department. A justice of the peace of the village, who also was acting police judge and who by reason of his duties had many occasions to be in the Municipal Building and often at night holding court, also testified that he had never heard any disturbing noise at night. These three village officials did testify, however, that they had heard when in the Municipal Building or while passing by the Odd Fellows Temple some noise incidental to bowling. One of the occupants of the apartment on the third floor of the Pellenz Block testified that she had never been disturbed by the bowling alleys, or had she heard any noise in the way of cheering coming from the building or from groups which might congregate in front of the building at night. The record shows that the bedroom which she and her husband occupied during the time here under consideration is at the front of the block and faces Green street. It will be recalled in this connection that one of the witnesses for the plaintiff lives in this same block on the second floor and that she testified that she had heard " lots of noise late at night and especially when they hit those pins because my window is right across from the bowling alley and I hear all the noise." Obviously, the testimony of these two witnesses is in sharp conflict. The local reporter for the Utica *Daily Press*, whose office is on the ground, or first, floor of this same Pellenz Block, testified that it was necessary for him to spend a great deal of time in his office at night, remaining there frequently as late as two or three o'clock in the morning, and that on no occasion had he been disturbed by reason of the bowling or any cheering which came from the building or from those on the street. The real estate agent, whose office is in the small wooden building formerly used as a tailor shop, testified that he had occasion to go

to his office at night and remain there until eight or nine o'clock, and that he had not heard any noise from across the street during the fall of 1938, but that during the winter of 1937–38, he had heard a rumbling noise such as caused by a ball rolling across the floor. He also said that on several occasions when he left his office at night he did hear some quite loud talking as several men or groups walked down the street.

As additional proof of the fact that the portion of Green street which we are considering is a business and not a residential street, it was established upon the trial that the only theatre in the village of Herkimer is on the easterly side of North Main street, just a little distance south of the First National Bank Building, and that many patrons who frequent this theatre park their automobiles during the evening on both sides of Green street, and that when the theatre is out late at night there is considerable noise due to starting the motors of these various parked cars. It was further brought out by one of the reporters of the *Evening Telegram* that it was necessary to operate at night on many occasions a printing press and that due to the operation of that press there was considerable noise which, in the opinion of the witness, could be heard " to either corner of Green Street." He testified that sometimes the press would start around midnight and sometimes at one or two o'clock in the morning, and that this practice was followed whenever it was necessary to prepare and print an unusually large amount of advertising.

Defendants in their answer deny only the allegations of the complaint that continuous bowling is permitted within the premises which they lease each week-day from eight o'clock in the evening until two or three o'clock in the morning of the following day, including Sundays, and from six o'clock in the afternoon on Sundays to midnight or later, " and that said bowling causes great noise which materially impairs plaintiff's enjoyment of his said dwelling house and constitutes a nuisance." They allege as separate defenses that Green street in the village of Herkimer, and particularly the premises which they lease, are near the center of the business district of the village, and that the neighborhood and neighboring streets " are largely devoted to business uses and purposes and the immediate locality has lost its character as a residential district; that the change from a residential to a business district has been in progress for some time past and is a progressive and continuing condition."

The general character of the neighborhood and whether the immediate locality is devoted to business purposes or is a residential section may be taken into consideration in determining, not whether

the use of any particular property therein constitutes a nuisance, but whether equity will interfere and grant the relief which is sought. (*Mackay-Smith* v. *Crawford*, 56 App. Div. 136; affd., 171 N. Y. 662.)

It is further alleged in their answer as a separate defense that their bowling alleys have been conducted at all times " with the consent and permission of the local authority and without any unusual noise and disturbance," and that the alleys were constructed by defendants at great cost and expense and that there was no complaint or objection by the plaintiff or any other person to their installation, although it was a matter of common knowledge that the bowling alleys were under construction, and they further state that if they are now denied the right to continue their business, their investment will be lost and they will actually suffer financial ruin and great and irreparable loss. They, therefore, ask judgment dismissing the complaint.

Evidently bowling is quite a popular pastime in the village and vicinity of Herkimer. There appears to be much competition among various teams which comprise leagues, and many league games or tournaments are played. One of the defendants testified that when the alleys are reserved for league games and are used exclusively by league teams, the games begin at seven o'clock and continue until eleven. He also testified that no league games are played on Saturday or on Sunday; that the alleys are open to the public at one o'clock in the afternoon and are closed at one o'clock in the morning and that whenever league games are being played any one may use the alleys after eleven o'clock and until one in the morning. He also said that on Sunday the alleys are opened at two o'clock in the afternoon and are available for use until midnight or one o'clock Monday morning. He admitted, however, that many so-called match games are played on the alleys, in which games five men on one side play five on the other, and that the alleys can be reserved for such games. As I understand it, these match games are different from league games in that the public generally participate in match games, whereas only members are allowed to play in the league games. Defendant said, however, that their alleys for the most part are used by league players and that when league games are in progress there is a certain amount of applause and at times some cheering, but no organized cheering, and that he had never heard any noise or disturbance outside of the building and that never, to his knowledge, was his place of business open as late as quarter to three in the morning.

That bowling does make some noise is self-evident. It must also be conceded that when four alleys are being played on simul-

taneously the noise incident to the sport is somewhat pronounced. On the alleys here in question most of the noise must occur at the rear of the building away from the street. It must also be conceded, it seems to me, that the winners in league or match games might be expected to talk about their victories upon leaving the building and while proceeding along the street to their cars or to their homes. Possibly, on some occasions, the "congregation," which was the word used by the plaintiff, did linger outside and indulge in talking. However, I have grave doubt as to the power and authority of this court in a proceeding of this kind to interfere with any such conduct and regulate the manner in which those who have been within the building must leave the building and return to their respective homes. The alleged nuisance complained of here is the great noise caused by the bowling within the building, and yet the plaintiff stressed the noise made by those outside the building. Any one might well be justified in complaining of similar conditions if his home happened to be located near a public building or club-house, or even a church or courthouse.

"When the plaintiff selected his home within the sounds of a city, he could not expect the silence of the country. He could not expect that the circumambient air would be altogether free from the smoke and other pollutions from the houses, shops or factories. If, like Lord Byron, he found 'the hum of cities horrible,' nevertheless he had to recognize that he could not either quiet or purify the air by halting men's business within the radius of his absolute comfort." (*Peck* v. *Newburgh Light, Heat & Power Co.*, 132 App. Div. 83, 85.)

A further important fact which must be recognized and considered in an action of this kind is the undisputed proof that defendants have already made a substantial investment in their business and are also liable on a written lease at one hundred dollars a month rental for an unexpired term of nearly four years. It was established upon the trial that the installation of the four bowling alleys on the second floor cost in the neighborhood of $2,400 for new material and labor. It is the law that an injunction does not necessarily follow in all cases where a nuisance exists. The equities of the parties must be considered (*Andrews* v. *Perry*, 127 Misc. 320, 326), and when the business complained of is lawful as is the case here the primary question is one of relative rights. (*People* v. *High Ground Dairy Co.*, 166 App. Div. 81, 82.)

Having full regard for well-established principles of law which are to be considered and applied in a case of this kind, I am satisfied that plaintiff has failed to establish facts sufficient to bring his complaint within these principles of law. The annoyance and

discomfort suffered by plaintiff from the operation of defendants' business are comparatively slight. This is shown and supported by the proof that since the installation of the celotex coverings over the large windows in the spring of 1938, the noise from the bowling has decreased appreciably. Slight inconvenience will not justify this court of equity in interfering with defendants' business by granting an injunction. " There are many acts which the owner of land may lawfully do, although it brings annoyance, discomfort or injury to his neighbor, which are *damnum absque injuria*." (*Booth* v. *R., W. & O. T. R. R. Co., supra.*)

Proof is lacking that defendants have made or are making an unreasonable use of their premises to plaintiff's material and substantial damage and this court, in my opinion, is not justified on the evidence in finding that defendants are maintaining a private nuisance. The use of the property which they lease is a reasonable use under all the circumstances and surroundings.

My conclusion, therefore, is that plaintiff is not entitled to the relief which he seeks, and his complaint should be dismissed on the merits.

Judgment accordingly.