Robert J. Traihor, J.
This is an action by plaintiffs on their own behalf, and on behalf of all other residents and property owners in the Towns of North Castle and Harrison similarly situated, for a permanent injunction restraining defendants, Board of Cooperative Educational Services, Second Supervisory District, Westchester County (hereinafter referred to as boces), and New York State Dormitory Authority (hereinafter referred to as authority), from constructing and operating a bus maintenance facility upon property originally acquired by boces on Old Orchard Street, in the Town of North Castle, Westchester County, New York, and .thereafter conveyed by it to authority for the purpose of such construction by authority and subsequent lease of the completed facility by authority to boces, pursuant to sections 1958 and 1959 of the Education Law, and section 1689 of the Public Authorities Law.
boces is an integral part of the State public education system created under and for the purposes set forth in section 1958 of the Education Law. Its 26 component public school districts are located throughout the southern half of Westchester County. It provides, for those districts on a co-operative basis, among other services, special education for handicapped children and occupational education for some 1,200 pupils. To provide legally required transportation for such pupils, boces owns, maintains and operates approximately 64 buses of varying sizes and capacities, plus several service vehicles.
In 1967, boces rented a garage in White Plains for bus maintenance purposes. Shortly thereafter it was advised that the garage was included in the White Plains urban renewal area and that its lease would not be renewed. Since the expiration of its lease in 1969, boces has occupied .the premises on a month-to-month basis and, at the time of the trial, it had received notice that it must vacate the premises on March 31, 1972.
As a result of the initial advice, boces in 1967 began a search for a new site and in September of that year received an offer to sell to it a two-acre site on Orchard Street, in the Town of North Castle, adjoining property already owned by boces, known as the Rye Lake Campus. After negotiations with the offerors and also with the Jennie Clarkson Home for Children, the owner of an additional adjoining site of one acre, boces entered into contracts to purchase both sites, conditioned upon a commitment from authority to finance the acquisition of the sites and the erection of the proposed bus maintenance facility thereon, and -authorization by boces’ qualified voters for such acquisition and construction.
*431 At a duly called and held meeting of such voters on February 14, 1968, boces was authorized, pursuant to sections 1958 and 1959 of the Education Law, and section 1689 of the Public Authorities Law, by a vote of 5,786 to 1,438 to, among other things, acquire the proposed site, and to enter into an agreement with authority for the erection thereon of the bus maintenance facility at an estimated maximum cost of $249,600. boobs did acquire the site and entered into the authorized agreement with authority which, in turn, entered into construction contracts. After all required authorizations and permits were obtained (which are still in effect) construction commenced November 6, 1969. This action for injunctive relief was commenced January 8, 1971.
The court, with the consent of the attorneys for both sides, has personally viewed the site and the adjoining properties.
Plaintiffs claim that the construction and operation of this bus maintenance facility will cause environmental pollution in violation of the New York Constitution (art. XIV, '§ 4), and of “ policies ” set forth in the Environmental Conservation Law, and will constitute a nuisance. Defendants vigorously dispute this.
Each case of alleged nuisance stands on its own facts. It depends upon the location, character of .the neighborhood, nature of the use, extent and frequency of the injury, the effect upon the enjoyment of life, health and property, and the like, (Slattery v. Herbstone Realty Co., 233 N. Y. 420; McCarty v. National Carbonic Gas Co., 189 N. Y. 40.)
As to the claimed constitutional question, in a companion action brought to enjoin the construction of this same facility upon the ground of an alleged violation of the same provision of the State Constitution (Town of Harrison v. Board of Co-op. Educ. Servs., Westchester County Clerk’s Index No. 71-14727), Mr. Justice Fauelli of this court, in an unpublished opinion dated January 13, 1972 granting summary judgment to defendants therein, held that the constitutional provision relied on did not apply to the. premises which were the subject of that (as well as this) action. This court concurs in that conclusion.
While plaintiffs refer to the “ policies ” of the Environmental Conservation Law, they have not called to the attention of the court, nor has the court ascertained, any specific provision of that law which the construction and operation of this facility will violate. The Commissioner of Environmental Conservation is empowered to “ Provide for prevention and abatement of all water, land and air pollution ” (Environmental Conser *432 vation Law, § 14, suM. 9); to “ Prevent pollution through the regulation of the storage, handling and transport of * * * liquids * * * which may cause or contribute to pollution ”, (Environmental Conservation Law, § 14, subd. 13) and the power to summarily abate any condition or activity which, after investigation, he finds £ £ presents an imminent danger to the health or welfare of the people of the state * * * or is likely to result in irreversible or irreparable damage to natural resources ” (Environmental Conservation Law, § 16).
The court finds it hard to believe, as was testified to by plaintiff’s expert, that a spill of one quart of oil would destroy all animal life in the marsh area of Cranberry Lake Park, when one considers, as the same witness asserted, that the oil spilled over several miles of Route 22, as well as from existing Orchard Street, winds up in Kensieo Reservoir, a principal source of drinking water for the City of New York, and a place where fish seem to thrive. The same thing would seem to hold true of new Route 684!
After construction of this facility commenced, vigorous protests from private citizens and local public officials were made to various county, State and Federal officials, including Governor Rockefeller. At the request of the Governor, the Commissioner of Environmental Conservation investigated the environmental factors involved in the construction of this facility and filed a report of his investigation and findings with the Governor, a copy of which report was received in evidence herein. After such investigation, the commissioner not only did not seek to abate or alleviate any action of defendants with respect to this facility as likely to result in irreversible or irreparable damage to natural resources, but found that the construction and operation of this facility would have minimal, if any environmental impacts.
Plaintiffs, although not relying upon a violation of the Town of North Castle’s zoning ordinance as a ground for an injunction, did urge that the placing of this structure in a residentially zoned district and with a setback less than the zoning ordinance requires, violated the ££ spirit ” of the zoning ordinance. It is settled law that school districts are not subject to local zoning ordinances and building or permit regulation (Matter of Board of Educ. of City of Buffalo v. City of Buffalo, 32 A D 2d 98; Union Free School Dist. No. 14, Town of Hempstead v. Village of Hewlett Bay Park, 279 App. Div. 618; Town of Poughkeepsie v. Hopper Corp., 46 Misc 2d 761, affid. 26 A D 2d 772; Town of Onondaga v. Central School Disk No. 1, 56 Misc 2d 26), and *433 .this rule has been extended to Boards of Cooperative Educational Services (Matter of Board of Co-op. Educ. Servs., Nassau County v. Gaynor, 60 Misc 2d 316, affd. 33 A D 2d 701, mot. for lv. to app. den. 26 N Y 2d 612). As bearing upon the equities herein, the proof showed that, after the construction of this facility had commenced, another school district had constructed an addition to its bus maintenance facility in a residentially zoned area in the same Town of North Castle without let or hindrance by the town officials or any of its residents '(for whose benefit this action is brought) and .that the Town of Harrison, for whose residents this action is also brought, itself constructed, maintains and operates a garage for its highway department trucks and equipment in a residentially zoned area. The property directly across the street from the site involved in this action, acquired by the County of Westchester in May, 1968, and now known as Cranberry Lake Park, is located in an area zoned for office buildings under the North Castle zoning ordinance.
Defendants would have exercised better judgment if they had originally located this facility farther back from the road. They have now agreed, however, to relocate it so that it will have a 34-foot setback. While this will not comply with the 50-foot setback called for by the zoning ordinance (if it were binding on defendants) there is no proof in the record .that the homes of nearby residents in this area (which was developed before any zoning ordinance existed) themselves comply with the presently required setback.
Those seeking to enjoin the legal use of another’s property on the ground of nuisance have the burden of establishing “ by clear evidence” (County of Sullivan v. Filippo, 64 Misc 2d 533, 554) that such use has or actually will result in a nuisance (Board of Educ. of Cent. School Dist. No. 3 v. County of Westchester, 34 Misc 2d 795, 798, affd. 18 A D 2d 966; State of New York v. Wright Hepburn Webster Gallery, 64 Misc 2d 423, 425, affd. 37 A D 2d 698; Metropolitan Life Ins. Co. v. Moldoff, 187 Misc. 458, 460, affd. 272 App. Div. 1039; Heaton v. Packer, 131 App. Div. 812, 814). A mere possibility is not sufficient. “ A court of equity will lend its aid to enjoin a threatened public nuisance wherever it clearly appears that the acts sought to be restrained will necessarily result in the creation or maintenance of a nuisance (Altschul v. Ludwig, 216 N. Y. 4591, 468; People v. Vanderbilt, 26 N. Y. 287, 293).” (City of Yonkers v. DYL & DYL Development Corp., 67 Misc 2d 704, 706; emphasis in original).
*434 Plaintiffs’ claim .of nuisance is based upon allegations that this bus facility would create noise, a traffic hazard, a fire hazard and, especially, would cause pollution in neighboring properties, in general, and to Cranberry Lake Park in particular. Cases involving alleged pollution are becoming increasingly common. The developing rule in such cases appears to be that injunctions will not issue automatically, even where pollution is proven, but only after a balancing of interests of gain to the community from the prevention of proven pollution against harm to the community from the loss of an industrial employer (Boomer v. Atlantic Cement Co., 26 N Y 2d 219; Diamond v. Allegheny Ludlum Ind., 67 Misc 2d 854; Diamond v. Mobil Oil Corp., 65 Misc 2d 75; Diamond v. Peter Cooper Corps., 65 Misc 2d 82).. Assuming pollution were proven here, the court would, by analogy to the cited cases, weigh the gain to the community and neighboring owners from the cessation of such proven pollution .against the fact that defendants are State agencies performing mandated governmental functions.
With respect to noise, the proof shows that when the Jennie Clarkson Home sold a portion of this site to boobs, for the protection of its remaining property and the privacy and comfort of its director (the nearest resident to the boobs facility), it exacted certain restrictive covenants by which boobs agreed to limit the .sound levels at which its operations would be conducted and, in addition, to avoid any unnecessary racing of engines; idling of engines for long periods of time; loud radio playing; .and to require all compressors to be housed and have mufflers.
The proof further showed that presently boobs’ supervisor of transportation and its automotive foreman perform their office work, including telephoning, and have secretarial assistance, within the interior of boobs’ present bus maintenance facility, and this practice will be continued at the new site. The report of Commissioner Diamond (supra), found that the potential for environmental hazard, related to noise pollution as a result of the operation of this bus maintenance facility, is minimal. This court concurs in .that finding.
Plaintiffs also complain that the bus maintenance facility will generate traffic which will constitute a hazard. The proof shows, however, that long before boobs acquired this and the adjoining former Nike missile site, the United States Army had utilized Orchard Street and the- access road leading to that site (which will be utilized by buses to and from this facility) for large heavy-duty army trucks (including ten-wheel vehicles *435 transporting missiles), and that boobs, since 1966, has traversed Orchard Street and the access road with school buses, all without incident. School buses will continue to utilize Orchard Street and the access road to transport children to and from its Bye Lake campus on the old Nike missile base site, even if this bus maintenance facility were never erected. The court finds that the bus maintenance facility will not create any additional traffic hazards.
Plaintiff produced testimony directed toward the inadequacy of the proposed fire protection. Fire protection for this facility, as for .other property in the area, is furnished by a municipal fire district. The proof shows that the defendants will have on their property a water supply adequate to provide immediate protection and sufficient to last until the arrival of the fire department apparatus in normal circumstances. Further, the only testimony as to the adequacy of fire protection concerns itself solely with the adequacy of the protection for defendants ’ proposed building and contents. Legally, this is no concern of plaintiffs and furnishes no basis for the granting of an injunction.
Plaintiffs’ main concern, however, is that this facility would pollute neighboring properties generally and Cranberry Lake Park in particular, by the leakage or drainage of oil or gasoline from the interior of the maintenance facility, or from the outside paved parking area. With respect to the interior, the proposed method of operations of the mechanical devices designed to capture any spillage or droppings of oil and similar products are, even as testified to by plaintiffs^ witnesses, those normally used in the operation of similar facilities and that mechanical devices are .sound in engineering principle, and fulfill the purpose for which they are designed.
The claim of the plaintiffs that the referendum held by boobs was illegal by virtue of section 401 of the Education Law is without merit inasmuch as that section refers to .school districts and boobs is not a school district. In any event, the vote of the referendum exceeded 7,000, whereas, even if applicable, subdivision 2 of section 401 of the Education Law requires but 5,000 to make a referendum unnecessary.
Although the original plans called for the oil separator (one of the devices provided for) to be connected to the water drainage system, these have been changed .so that it will now he connected to its own leaching pit. The Diamond report (supra), found that the likelihood of contamination of water supplies from this facility was “remote”; that the oil separator and *436 leaching pit would contain surface oil .spillage; and that the safety precautions incorporated in the facility (the existing drainage patterns, vegetation cover, .the distance of the facility from the lakes in Cranberry Lake Park) made “ contamination of Cranberry Lakes very unlikely
The drainage from the outdoor parking area runs for approximately 400 feet through concrete pipes and finally discharges under and across Orchard Street. Any oil or gas spillage on the asphalt parking area would be absorbed or evaporated, to some extent. Oil accretes to concrete catch basins and pipes and, in the course of the 400-foot run plus the two catch basins at the end, the oil, except for an improbable quantity, presumably would be completely absorbed. Assuming any oil did escape at the end of this run, it would be absorbed by the earth of the drainage ditch and, damage if any to vegetation would be minimal and temporary.
The plans originally called for oil heating for this facility with an underground steel storage tank. These plans have been changed to provide electric heating, thus eliminating storage of oil for heating, one of the feared sources of air or ground pollution.
The Diamond report’s findings, with which the court agrees, further indicate “ minimal environmental impacts on surface and ground waters, vegetation, fish, wildlife, and other related natural resources resulting from construction and operation of this bus maintenance facility”.
After objections to this facility were received, boces, in order to make this facility more attractive to its neighbors and to provide additional safeguards against possible pollution or other ill effects has, in addition to the changes already discussed, decided to make further changes (which the authority will approve): i.e., reduce the height of the roof by two feet and add the architectural feature of a mansard roof to make the appearance of the building more pleasing; to provide landscaping for .screening purposes between the front of the building as relocated on Orchard .Street; to substitute a curbed area filled with trap rock for the paved parking area around the gas pumps to allow any gasoline seepage to evaporate; to substitute a fiber glass gasoline storage tank in place of the steel one; and to eliminate the washbay and all washing of buses on the premises.
In summary, the court finds that the plaintiffs have failed to prove that .the construction and operation of this facility will (and on the whole case defendants have proven that it will not) *437 constitute a nuisance on account of noise, traffic hazards, fire protection aspects, pollution of neighboring properties, including Cranberry Lake Park and its natural resources, or for any other reason.
Two additional factors negate the granting of an injunction: (1) There is no proof: that plaintiffs’ properties will suffer a diminution in value, a requisite for the granting of an injunction against an alleged nuisance, whether public or private (Graceland Corp. v. Consolidated Laundries Corp., 7 A D 2d 89, 91, affd. 6 N Y 2d 900; Van Cortlandt v. New York Cent. R. R. Co., 265 N. Y. 249, 262, 263; Town of Hempstead v. Village of Rockville Centre, 67 Misc 2d 123, 126; Canfield v. Quayle, 170 Misc. 621, 625); and (2) construction of this facility began on November 6, 1969, and this action was not commenced until January 8, 1971, and meanwhile defendants had expended in excess of $122,000; therefore, plaintiffs have been guilty of laches to the detriment of defendants (Zaccaro v. Congregation Tifereth Israel, 20 N Y 2d 77).
Accordingly, the motions to dismiss the complaint at the close of the plaintiffs’ case and at the close of the entire case, upon which decision was reserved, are granted and judgment is granted to defendants dismissing the complaint on the merits.