OPINION OF THE COURT
John J. Conway, J.
This is an action brought by the State of New York, for *352 itself and as parens patriae on behalf of the citizens of New York, seeking to enjoin permanently the use of certain property in the Village of Waterloo for stock cars. The named defendants are the Seneca County Agricultural Society, owner of the Seneca County Fairgrounds where the races take place and Waterloo Stock Car Raceway, Inc., lessors of the fairgrounds and promoters of the stock car races. Regular weekly stock car racing was a feature at the fairgrounds from 1954 until 1971. From 1971 until late 1976 this use was abandoned, not to be recommenced until defendant, Waterloo Raceway, in September, 1976, reinstated weekly racing at the grounds. The racing continued into the 1977 season with the schedule beginning in April and ending the 1st of October. The hours of operation are such that the cars begin to warm up before the scheduled 7:00 p.m. starting time and the last race does not end until approximately midnight. With the exception of one date in June when operation was enjoined by a temporary restraining order, the races continued to be held. It should be noted that some auto racing had taken place at the fairgrounds between the years 1939-1954, but only incident to the county fair, which lasted at most one week.
At trial the plaintiff produced 16 lay witnesses, residents of the Village of Waterloo, who, in general, testified to the disturbance created in the neighborhood by the stock car racing. In addition, the plaintiff produced two expert witnesses. The first, William Burnett, Director of Engineering Research and Development for the New York State Department of Transportation, testified as to the inadequacy of the guiderail surrounding the race track. Dr. Fred G. Haag, Principal Accoustical Engineer for the Department of Environmental Conservation, followed, and testified as to the noise levels created on race night by the operation of the raceway. The court found the technical evidence presented by Dr. Haag, as well as his opinion as to the injurious effect the loud noise can have on the populous of the community, to be highly persuasive.
The evidence introduced by Dr. Haag consisted of scientific sound level data, collected at seven residential locations in the Village of Waterloo while racing was in progress. For purposes of comparison Dr. Haag also recorded sound level readings during ambient or normal activity periods at six of these same locations. The court was impressed by the precautions Dr. Haag took to assure himself that the readings were scientifi *353 cally and fairly taken and not variant, extreme noise levels. The record reflects his effort in this regard.
What he found was, on the average, during the approximately three and one-half hours of racing while he tested, noise levels were from two to eight times as loud as normal. This by itself is meaningless, unless it is further noted that the noise levels during the race were of such magnitude as to exceed the EPA maximum acceptable day-night sound level by a wide margin. In fact, the intensity was so great that normal conversation at the seven locations was found to be impossible at a distance greater than four feet, and at four of those locations, beyond two feet.
The standard previously mentioned as being set by the United States Environmental Protection Agency is 55 DBA’s. Such a level is expected to protect the public with an adequate margin of safety and to prevent annoyance and excessive community complaints. The average level of decibels that Dr. Haag arrived at for the seven locations were far in excess of an acceptable range. In his opinion, Dr. Haag testified that he would expect widespread annoyance and significant community reaction in response to the noise levels.
Dr. Haag’s data represents a wide sampling of readings taken both while cars were actually racing and while there was a lull in the actual racing. As such they are a representative average of noise levels that one would hear during the duration of the racing, from four to five hours or more. Loud noises of such a long duration have a more severe impact in terms of causing annoyance than do louder outbursts of shorter duration.
The 16 lay witnesses who testified at trial were neighbors in the vicinity of the racetrack. The majority of them live within a few hundred feet of the racetrack. Others were from two and one-half blocks to three fifths of a mile distant from the track. The main complaint of all of these residents concerning the operation of the racetrack is the loudness of the noise and the disturbing effect it has on them. The nearly universal description of the noise is that of a constant roar. As a consequence of this audio intrusion upon their lives, the witnesses testified to a serious alteration of their lifestyles in a futile attempt to adapt. Some keep their windows closed regardless of the heat, others make it a point to absent themselves from their homesteads on race nights, and most of them have been forced to cease using their out-of-doors prop *354 erty for entertainment of guests and for recreation on these nights. Conversation, whether in the homes or outside, has become exceedingly difficult due to the loud noise. A common complaint was that sleep both for the adults and their children has been inhibited. As a consequence of this lack of rest plus the constant roar, nervous tension and wracked nerves have resulted.
The noise is not the only suffering for the residents of the area. They also testified to clouds of dust being produced by the races which accumulated on their property. Apparently the range of the falling dust is as great as that of the noise. For those upon whom it comes to rest it necessitates washing of items of personal property after the day of the race.
Also of concern to the residents is that there is a definite danger of safety in the vicinity of the raceway from launched projectiles. Undisputed testimony was had at trial that at one time a racing tire flew across the street and hit a witness’ garage, that on other occasions steel guiderails have fallen apart upon impact from the autos and have even been projected as far as the public street, and that on May 30, 1977 at one of the races a car was forced off the track and landed on three parked cars, not far from a residential property. There was also testimony as to serious accidents at the track that endangered spectators and neighboring residents in years previous to Waterloo Raceway, Inc. operation. Although defendant cannot be held responsible for these past incidents, they are noteworthy in light of expert witness Burnett’s testimony that there still exists a decided danger of cars breaking the guiderails. This was not the end of the testimony of plaintiff’s witnesses as to the intrusions and hazards accompanying the operation of the raceway. No doubt some would view the testimony as a litany of sufferings, but there is no question but that they add up to a severe alteration of an otherwise tranquil neighborhood. They take a toll on public endurance and tolerance. The witnesses, as can be expected, displayed a variety of temperaments, faculties and sensitivities, in part depending on the location of their home. But all were marked by intelligence, character and honesty which was apparent and impressive.
The court has not ignored the testimony presented by the defendants’ witnesses. However, out of the 14 witnesses, 10 have an interest in seeing the races continue, due either to a monetary stake or because they themselves or members of *355 their families are race enthusiasts. It is to be expected that those who frequent the races are more prone to tolerate whatever disturbance it creates. The four witnesses who have no apparent interest in seeing the races continue, yet testified that they were not bothered by the din it created are to be congratulated as being extremely tolerant. All admitted being aware of the noise, but none found it to be uncomfortable or disturbing. The court is not convinced that these are the residents of the Village of Waterloo who are possessed of average sensibilities (People v Rubenfeld, 254 NY 245; City of Rochester v Charlotte Docks Co., 114 NYS2d 37), particularly in light of the testimony from the 16 local residents for plaintiff, the expert witnesses and the proposed 48 additional witnesses whose testimony would have corroborated that of plaintiff’s witnesses who had gone before them.
The foremost issue facing this court is whether the cumulative effect of the noise, dust and danger to safety from the operation of the raceway constitutes a public nuisance. Although numerous cases in New York have been devoted to a discussion of what conditions constitute a nuisance, no case, brought to this court’s attention deals with the exact subject matter of the operation of an auto racetrack as a nuisance. Courts in other States have declared raceways or dragstrips to be a nuisance upon a showing of facts much the same as plaintiff presented here. (Kohr v Weber, 402 Pa 63; Bedminster Twp. v Vargo Dragway, 434 Pa 100; Sakler v Huls, 20 Ohio Opns 2d 283, and see Ann. 41 ALR3d, 1273, Automobile Racetrack or Drag Strip as Nuisance.) But these cases fail to elucidate the New York law on this matter and furthermore each nuisance case must be addressed on its own facts to determine whether, under all the circumstances, such as location, surroundings, nature of the use, extent and frequency of the injury, and the effect on the enjoyment of life, health and property, the use of the property by defendant is unreasonable. (McCarty v Natural Carbonic Gas Co., 189 NY 40; Campbell v Seaman, 63 NY 568; Town of Preble v Song Mountain, 62 Misc 2d 353; and Shearing v City of Rochester, 51 Misc 2d 436.)
 As the term "public nuisance” has been employed by New York courts, it is incapable of any exact or comprehensive definition. (Melker v City of New York, 190 NY 481; see, also, Prosser, torts [4th ed], p 571.) Judge Cardozo, in People v Rubenfeld (254 NY 245, 247, supra), perhaps came the closest *356 to indicating what exactly a public nuisance is. "Public is the nuisance whereby 'a public right or privilege common to every person in the community is interrupted or interfered with,’ * * * Public also is the nuisance committed 'in such place and in such manner that the aggregation of private injuries become so great and extensive as to constitute a public annoyance and inconvenience, and a wrong against the community, which may be properly the subject of a public prosecution’ ”. (Also, see, Copart Inds. v Consolidated Edison Co. of N. Y., 41 NY2d 564; New York Trap Rock Corp. v Town of Clarkstown, 299 NY 77; and Town of Preble v Song Mountain, supra.)
It should be clear that while almost any form of amusement or recreation can constitute a nuisance, as long as it is lawfully conducted it is not a nuisance per se. (3 NY Jur, Amusements, § 27.) Therefore, it must be established by clear evidence before the preventive remedy will be granted. (County of Sullivan v Filippo, 64 Misc 2d 533.)
As has been stated again and again, a public nuisance is an offense to the public of a neighborhood or community in the enjoyment of its common rights, as distinguished from activity which results merely in injury even to large numbers of persons in the enjoyment of private rights, not shared by members of the community or neighborhood at large. (State v Wright Hepburn Webster Gallery, 64 Misc 2d 423, affd 37 AD2d 698; Copart Inds. v Consolidated Edison Co. of N. Y. supra; People v Rubenfeld, supra; New York Trap Rock Corp. v Town of Clarkstown, supra; and 42 NY Jur, Nuisances, § 5, p 449.)
"[T]he number of persons affected need not be shown to be 'very great’ * * * Enough that so many are touched by the offense and in ways so indiscriminate and general that the multiplied annoyance may not unreasonably be classified as a wrong to the community.” (People v Rubenfeld, 254 NY 245, 247, supra.) "[It is a public nuisance] where the location at which and the manner in which the [particular operation] is conducted is such that it causes substantial annoyance and discomfort indiscriminately to many and diverse persons who are continually or may from time to time be in the vicinity.” (Town of Mount Pleasant v Van Tassell, 7 Misc 2d 643, 645, affd 6 AD2d 880; People v HST Meth, 74 Misc 2d 920.)
The complaints generated and the facts established in this case by the operation of the racetrack are not of a private nature; rather they expose an assault on the community as a *357 whole. The common right involved is that of the neighborhood to its normal peace and quiet, which is one of its essential characteristics. Practically all the witnesses at trial agreed that this is a tranquil community. Were it not for the existence of the racetrack operations it would continue as such. As it is, everyone in the vicinity of the track has found their eardrums to be hammered away at during the nights the races take place, to expect an aftermath of dust accumulation on their property, and to live in fear for their continued safety. Anyone visiting these people in their homes or passing by on the public streets is subjected to the same onslaught of the senses and fear for safety. To be free of these conditions is a right which the neighborhood possesses at large, and not one which one man or a few men covet to themselves. It is an affront to and invasion of the community in the enjoyment of its common rights.
This is not a case where the populous is grumbling about mere trifles and slight indecencies. If it were, the court would turn a deaf ear. (See McCarty v Natural Carbonic Gas Co., 189 NY 40, supra; and Prosser, Torts [4th ed], p 577.) Instead this is a completely unreasonable use of defendant’s premises to the material injury of his neighbor’s premises and his person, and need not be suffered any longer. (McCarty v Natural Carbonic Gas Co., supra; Campbell v Seaman, 63 NY 568, supra; Pritchard v Edison Elec. Illuminating Co. of N. Y., 179 NY 364.)
The community has been assailed on a weekly basis. The residents fear for their own bodily safety and for that of their property because of the danger from flying guiderails, racing tires, wood and errant cars. Although accidents are a fairly commonplace occurrence in the sport of auto racing, the danger of falling debris from these collisions is not a fear which the community at large should be subjected to. As conditions at the track stand now, it is only a matter of time before a resident of the neighborhood or innocent passerby is injured. Until now this fortunately has not happened, although there have been reports of damage to property. This court sees no reason why this community should be subjected to this danger any longer.
Defendants have countered that the operation of the racetrack is being lawfully conducted and is not in violation of zoning ordinances, being a prior existing use in a residentially zoned area, and therefore is not subject to attack as a nui *358 sanee. As recently as in the case of Little Joseph Realty v Town of Babylon (41 NY2d 738) the Court of Appeals stated that the use may be in full compliance with zoning ordinances but that it may still be enjoined as a nuisance. Every business has a duty to conduct its operations in a reasonable manner such that it does not materially interfere with the general well-being, health or property rights of neighbors or of people generally. (Town of Mount Pleasant v Van Tassell, 7 Misc 2d 643, affd 6 AD2d 880, supra.)
Defendant asserts its alleged priority of occupation in the neighborhood as a defense to this action. The basis for this contention is the fact that racing took place on a regular, weekly basis between the years 1954-1971 and that most of those who moved to the area since 1954 were aware of the situation and therefore were guilty of coming to a nuisance and should not be heard to complain. Defendant’s contention is not well founded because, to begin with, it is established in New York that priority of occupation is not conclusive, but is to be considered in connection with all the evidence, and the inference drawn from all the facts proved whether the controlling fact exists that the use is unreasonable. (City of Rochester v Charlotte Docks Co., 114 NYS2d 37, supra; McCarty v Natural Carbonic Gas Co., 189 NY 40, supra; Graceland Corp. v Consolidated Laundries Corp., 7 AD2d 89, affd 6 NY2d 900.) Also, in determining whether one who "came to the nuisance” may obtain relief therefrom, it is proper to consider the nature of the area where the alleged nuisance and complainant property are located. (McCarty v Natural Carbonic Gas Co., supra.) Therefore, there is no absolute defense of priority of occupation and one cannot acquire by prescription the right to maintain a public nuisance.
The facts of the case, as they relate to priority of occupation are these: that many of the complainants moved to this area before the fairgrounds were ever used as a racetrack for autos or during the period 1971-1976 when regular use for racing had been discontinued. Furthermore, this area is unquestionably residential and has been zoned as such since 1949. Persons coming into the area and established residents had come to believe by 1976 that the days of regular, weekly stock car racing at the fairgrounds were over. The fact of the previous intermittent use, which defendant has not shown to have generated the same disturbance as the present use, does not now operate to estop this action.
*359 The county fair itself stands in a different position. It is the type of operation which is but a minor, passing inconvenience at most, and which people who collect in cities and towns are expected to tolerate. As plaintiff’s witnesses testified, the noise is not nearly as oppressive as that of stock car races. For those who do find it unbearable it is not too much to ask of them that they suffer silently or use the occasion to occupy themselves away from their homes.
This court concludes that while there is nothing unlawful about the operation of a stock car raceway under proper circumstances, its use at its present location in the Village of Waterloo, under all the circumstances, constitutes a public nuisance and should be discontinued. "A nuisance may be merely a right thing in the wrong place”. (Euclid v Amber Co., 272 US 365, 388.)
As the Court of Appeals indicated in Boomer v Atlantic Cement Co. (26 NY2d 219), an injunction is a drastic remedy which a court must carefully consider before issuing. This court has been most circumspect in pondering on its issuance but has concluded that it is the only appropriate remedy under the circumstances. Unlike Boomer, there is no vast disparity in economic consequence between the use of an injunction and the injury caused by the nuisance. In Boomer, the defendant corporation had a $45 million investment in the plant and it provided jobs for 300 people. This essentially recreational operation employs few people and, as defendant’s own affidavit details, the capital investment at most amounts to $15,000. No sound reason mitigates against the issuance of an injunction in this instance. The injury to the public is serious and permanent and no adequate remedy exists at law.
Accordingly, it is ordered that defendant Waterloo Raceway, Inc., and any successor in interest is permanently enjoined from operating a stock car racetrack or any related activity involving motorized vehicles on the premises of the Seneca County Fairgrounds in the Village of Waterloo. Defendant Seneca County Agricultural Society is likewise permanently enjoined from conducting or leasing for purposes of allowing another to conduct stock car races or any related activity involving racing motorized vehicles. The foregoing injunction is subject to the following exception, that the defendant society may allow or conduct such events as a motorcycle race, demolition derby or stock car race, but such exception is limited to the period during the year when it holds its annual *360 Seneca County Fair. Such period of racing and other auto events may not exceed three separately scheduled days in total.