OPINION OF THE COURT
Alan D. Oshrin, J.
PACTS
The defendants and their predecessors have been and are *526 the manufacturers and distributors of a herbicide known as Dachtal. Dachtal had been sold in Suffolk County for more than 20 years until 1989. The active ingredient found in Dachtal is dimethyl tetrachloroterephthalate (DCPA). Since 1958 DCPA has been registered for use as a herbicide with the United States Department of Agriculture (later the United States Environmental Protection Agency). Although not now used in Suffolk County, DCPA is registered for use in New York State by the New York State Department of Environmental Conservation. DCPA is no longer registered for use in Suffolk County.
DCPA acts at the soil surface to inhibit or prohibit the growth of plants which would interfere with the growth of the crops. After DCPA is placed on the soil surface it does not enter the subsurface. It changes or degrades into monomethyl tetrachloroterephthalic acid (MCPA). MCPA has a very short half life and in turn changes or degrades into tetrachloroterephthalic acid (TCP A). TCP A does enter the subsoil and has been found in the water supply of Suffolk County. Since 1977 ISK Biosciences Corporation (hereinafter ISK) (an earlier corporate form of the defendants) has engaged in a groundwater monitoring program. As a result of the program, ISK became aware that TCP A was found in the Suffolk County groundwater and-so informed the New York State Department of Health and the Suffolk County Department of Health Services in 1982. At that time representatives of the State requested toxicology data relating to TCP A.
Suffolk County’s water supply is contained in its aquifers. An aquifer is an area beneath ground surface. Water enters the aquifer from the ground and moves generally down through the aquifer and also in a northerly or southerly direction dependent upon the location in relation to the center of the island. While moving to the north, the water moves to the Long Island Sound, or while moving to the south to the Atlantic Ocean. The aquifer is composed of sand through which the water moves. There are layers of clay separating the aquifers. The water does not pass through the clay. As the water moves from the surface to the subsurface, and then through the subsurface, it carries with it certain substances. Among these substances is TCPA.
Prior to 1982, the New York State Department of Health had developed and applied guidelines with respect to classification of substances known as unspecified organic contaminants (UOC) which may be found in the water supply. Rather than *527 fix guidelines which would set forth the amount of a particular substance which might be found in the water supply, and also found not to be harmful on a chemical-by-chemical basis, the Department applied guidelines to all substances known as unspecified organic contaminants and provided that no such single substance should be found in the water supply in excess of 50 ppb. In November 1988, effective January 1989, the guidelines became regulations within the State Sanitary Code (10 NYCRR 5-1.52, table 3). Anticipating this regulation in June of 1988, the defendants had petitioned the Environmental Protection Agency to permit an amendment to the Dachtal label prohibiting the use of the product in Suffolk County. The request was approved in October of 1988, and the Dachtal labels were immediately modified.
After being advised that TCPA had been detected in the Suffolk County groundwater, the Health Department requested toxicology data with respect to TCPA because no such data had been reviewed in developing the drinking water guidelines referred to above. A Ninety Day TCPA Study conducted in 1977 was supplied by the defendant’s representatives. Concomitantly, the defendants sought an increase in the 50 ppb guideline as it pertained to TCPA. That request was denied. Dr. Kim, on behalf of the State Health Department, after reviewing the data, stated that it did not support an increase in the 50 ppb guideline, and said the data "appeared inadequate for characterizing chronic toxicity”.
With respect to the public nuisance causes of action, the State, County and SCWA needed to establish that TCPA in the water supply in excess of 50 ppb was harmful or potentially harmful to the health, safety and comfort of a considerable number of persons. The plaintiffs attempted to do so primarily by use of the Ninety Day TCPA Study in rats conducted in 1977, and a comparison of the nature and properties of TCPA and DCPA. At the outset the court makes the following observations. At no time did the State, County or SCWA conduct an independent toxicity study. Four other studies of TCPA were conducted (a battery of mutenogenocy studies to determine whether TCPA could be cancerous by reacting with DNA; a teratology test to determine whether TCPA would induce birth defects and a 30-day gavage study to determine the toxicity of TCPA) but were not viewed as significant by the plaintiffs’ experts.
Doctors Kim, Blanck, Bradlow, Nisbet and Luttinger testified on behalf of the plaintiffs. The Ninety Day Study involved *528 feeding rats TCP A at dosage levels of 50, 500, 1,000 and 10,000 parts per million (ppm). Fifteen male and 15 female rats were used at each dosage level and also in a control group. The study report is comprised of (a) the summary, (b) analysis of the clinical studies, (c) a results section, (d) a pathological studies section, and (e) a section containing the raw data. The summary of the study concluded that no changes were found in general behavior, appearance, body weight, food consumption, ophthalmoscopic examinations and hematological, biological and urine analysis studies. Further the summary of the report noted no microscopic lesions and no compound related gross pathological lesions or organ weight variations observed in any rats.
Dr. Kim is the Director of the Division of Environmental Health Assessment for the New York State Department of Health. It is Dr. Kim’s function to assess the risk to humans from exposure to chemicals. Dr. Kim, who had reviewed the report in the 1980’s in connection with the defendants’ request for an increase in the 50 ppb standard, had found, as noted previously, that the data contained in the study "appeared inadequate for characterizing chronic toxicity”. During the trial Dr. Kim testified when asked whether TCP A is not carcinogenic: "correct, I don’t know that it is not a carcinogen. There are no data elucidating whether it is a carcinogen right now”. Dr. Kim also testified that she did not assume TCP A to be a cancer causing agent. Dr. Kim later testified "the way I would phrase that is that it is above a level that we have calculated using scientific and regulatory procedures that it is thought to be without appreciable risk” and "the most I feel comfortable saying, would I feel comfortable saying is that above a level that is thought to be without appreciable risk”, continuing "it doesn’t necessarily mean that something is going to happen”. In response to the court’s inquiry "is there an appreciable risk?”, Dr. Kim stated, "one could [say] that’s the inference, yes”. Dr. Kim also testified that she has low confidence in the reference dose of TCP A insofar as the amount which she believes would cause harm, conceding there are significant data gaps in her knowledge of TCP A and states that "if I can’t say that you will have an adverse effect, I can say they are at risk of having an adverse effect”. Prior to her testimony at trial, Dr. Kim had opined that TCP A was not toxic.
Dr. Kim concludes that the standard of 50 ppb should be lowered to 18 ppb as a result of her analysis of the Ninety Day Study and because of her conclusion that DCPA is structurally *529 very similar to TCPA. In analyzing the Ninety Day Study, Dr. Kim bases her conclusion upon the fact that the organ weights of some of the rats which were the subject of the study decreased in size as a result of the administering of the TCPA.
While the number of rats tested is small, Dr. Kim seeks to buttress her conclusion by stating that there is a statistically significant change in various organs, including the thyroid, pituitary and adrenal glands. WThen asked whether ingesting TCPA in excess of the State regulations would cause harm to the individual, Dr. Kim stated that "it doesn’t necessarily mean something is going to happen”.
Drs. Nisbet and Luttinger upon their initial review of the Ninety Day Study concluded that TCPA was not harmful. Drs. Nisbet and Luttinger changed their respective opinions upon the trial after being provided with a complete legible copy of the Ninety Day Study. Each witness’s initial conclusion was based upon a "review” of a copy of the study report with illegible backup material. Experts who offer an opinion based upon only the summary of a report or upon part of a report without the opportunity to examine the backup material offer opinions which are suspect. Further, Dr. Nisbet initially characterized the Ninety Day Study as "not very useful” because it did not show toxic effects and the sample size was too small. While he later found toxic effects he failed to explain why the small sample size was no longer significant.
These witnesses concluded that because the organ weights of some organs, such as the adrenal, the pituitary, the thyroid and the testes/ovaries of some rats who ingested TCPA were lower and because of increased SCOT levels of some rats receiving TCPA, TCPA is harmful to humans. These witnesses also found support for their position by the comparison of TCPA with DCPA, suggesting that both substances are structurally similar and both effect the thyroid and, thus, since DCPA is known to be harmful, TCPA should be found to be harmful.
The testimony of Dr. Bradlow, the endocrinologist called by the State as a rebuttal witness, is not helpful to the State’s position because of his failure to assert the point at which TCPA would be harmful. WThile Dr. Bradlow notes the shrinkage of certain organs, such as the pituitary, the ovary, the thyroid, or the adrenal glands, he fails to observe the dose levels of TCPA at which the shrinkage occurs. The rats which were subject to the Ninety Day Study received dose levels as high as 10,000 ppm, which is far in excess of the prohibited concentration level of 50 ppb for drinking water. Additionally, Dr. Bradlow *530 acknowledged that he could not quantitate the amount of change.
The defendants offered testimony from Drs. Lucas, Lamb, Harbison and Hartung, all board-certified toxicologists, as to the significance of the Ninety Day Study. The unanimous conclusion was that no TCPA related effects were observed with respect to rats administered up to 10,000 ppm of TCPA in the diet. (It is necessary to note that an amount of TCPA in the water measured in ppb must be translated into an amount of TCPA in the diet measured in ppm. Explanation of that formula is not germane to resolution of this matter.)
The defendants established that adverse effects generally relate to organ weight increases, not decreases, as observed in a few rats in the Ninety Day Study. The defendants also established the absence of histopathological findings, that is an absence of observable cell changes supporting their position that whatever changes were noted in the Ninety Day Study were not biologically significant. Another finding consistent with the foregoing is the absence of noted changes as to the animals’ behavior. Finally, the absence of a dose response pattern is compelling in support of the finding that TCPA is not harmful. Dose response pattern means when a dose of the tested substance is changed there is a measurable defined pattern of change observed in the test subject.
With respect to the comparison between TCPA and DCPA Dr. Kim testified that the two are structurally similar and suggests therefrom that because DCPA is harmful TCPA is harmful. Dr. Kim’s position is not supported by the evidence. While the two substances are structurally similar, they are dissimilar in that DCPA is lipid soluble, that is soluble in fats, and therefore more likely to spend more time in the body being absorbed by fats as it passes through the body as opposed to TCPA which is water soluble and to a larger extent moves through the body and then is excreted or expelled. Because the DCPA remains in the body for a much longer period of time than does the TCPA, the DCPA will effect different organs differently than will TCPA. TCPA is also less reactive than is DCPA. Additionally, the physio-chemical properties of the two substances are different making a toxicological correlation difficult if not impossible.
After considering the testimony of the plaintiffs’ experts and the defendants’ experts with regard to the Ninety Day Study, including the testimony from the statisticians and after considering the comparison of the properties DCPA and TCPA, *531 the court finds that the plaintiffs have failed to establish by a fair preponderance of the credible evidence (and therefore have failed to establish by the higher clear evidence standard for public nuisance) that TCP A in excess of 50 ppb in the Suffolk County water system is harmful to the population, or that TCP A in excess of 50 ppb creates a threatened harm. The testimony of the defendants’ witnesses is found to be more credible, and that of the plaintiffs’ witness not to be persuasive.
SUBSTANTIVE ISSUES PUBLIC NUISANCE
"A public nuisance, or as sometimes termed a common nuisance, is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency * * * It consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all * * * in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons” (Copart Indus. v Consolidated Edison Co., 41 NY2d 564, 568, discussing Restatement, Torts, notes preceding § 822; New York Trap Rock Corp. v Town of Clarkstown, 299 NY 77; Melker v City of New York, 190 NY 481 [1908]; see also, State of New York v Schenectady Chems., 117 Misc 2d 960; State of New York v Shore Realty Corp., 759 F2d 1032 [1985]; United States v Hooker Chems. & Plastics Corp., 722 F Supp 960 [1989]; New York State Natl. Org. for Women v Terry, 704 F Supp 1247 [1989], mod 886 F2d 1339 [1989], cert denied 495 US 947 [1990]). To establish a public nuisance the annoyance, discomfort or interference experienced by a considerable number of persons must be substantial (see, Burns Jackson Miller Summit & Spitzer v Lindner, 59 NY2d 314 [1983]; Town of Mt. Pleasant v Van Tassell, 7 Misc 2d 643 [1957], affd 6 AD2d 880 [1958]; see also, McCarty v Natural Carbonic Gas Co., 189 NY 40; Stoneburner v O-Gas-Co Sales Corp., 135 Misc 216 [1929]).
Although there is no requirement that the State prove actual, as opposed to threatened, harm from the nuisance in order to obtain abatement (see, State of New York v Shore Realty Corp., 759 F2d 1032, 1051, supra, citing Southern Leasing Co. v Ludwig, 217 NY 100 [1916]; United States v Hooker Chems. & Plastics Corp., 722 F Supp 960, supra) in order to recover for apprehended consequences not presently manifest, the State must establish a degree of probability of occurrence *532 as to amount to a reasonable certainty that they will result (see, Askey v Occidental Chem. Corp., 102 AD2d 130 [1984]; see also, Strohm v New York, Lake Erie & W. R. R. Co., 96 NY 304 [1884]). Damages for the prospective consequences of a tortious injury are recoverable only if the prospective injury may with reasonable probability be expected to flow from the past harm. Consequences which are contingent, speculative or merely possible are not properly considered in ascertaining injury, damages and appropriate remedy (see, Askey v Occidental Chem. Corp., 102 AD2d 130, supra; Strohm v New York, Lake Erie & W. R. R. Co., 96 NY 304, supra). Similarly, it has been said that a court of equity will lend its aid to enjoin a threatened public nuisance wherever it clearly appears that the act sought to be restrained will necessarily result in the creation or maintenance of a nuisance (Altschul v Ludwig, 216 NY 459 [1916]; Durand v Board of Coop. Educ. Servs., 70 Misc 2d 429 [1972], affd 41 AD2d 803 [1973]). When a harm feared does not yet exist the State must show a menace of imminent and substantial import to the public welfare to obtain the equitable relief (see, Southern Leasing Co. v Ludwig, 217 NY 100, supra; City of Yonkers v Dyl & Dyl Dev. Corp., 67 Misc 2d 704 [1971], affd 38 AD2d 691 [1971]).
While ordinarily nuisance is an action pursued against the owner of land for some wrongful activity conducted thereon, everyone who creates a nuisance or participates in the creation or maintenance of a nuisance are liable for the wrong and injury done thereby (see, State of New York v Schenectady Chems., 117 Misc 2d 960, supra; Suffolk County Water Auth. v Union Carbide Corp., NYLJ, May 2, 1991, at 28, col 1; United States v Hooker Chems. & Plastics Corp., 722 F Supp 960, supra; 17 Carmody-Wait 2d, Actions for Waste, Nuisance, and Trespass § 107.59). A nonlandowner can be liable for taking part in the creation of a nuisance upon the property of another (see, State of New York v Schenectady Chems., 117 Misc 2d 960, supra). Whether the claim of nuisance is based upon affirmative acts of negligence in the creation of a nuisance or dangerous condition or on liability for an abnormally dangerous activity or condition, ownership or possession of the property upon which the condition was found is not a prerequisite to responsibility for the injury or damage resulting therefrom (see, Suffolk County Water Auth. v Union Carbide Corp., supra, citing Merrick v Murphy, 83 Misc 2d 39 [1975]). Control over the product which caused the dangerous condition, therefore, is not a material element of a cause of action in nuisance (see, Suffolk County Water Auth. v Union Carbide Corp., supra).
*533 The burden is on the plaintiffs to establish a public nuisance by clear evidence before the preventive remedy of abatement will be granted (see, Board of Health v Copcutt, 140 NY 12 [1893]; Hoover v Durkee, 212 AD2d 839 [1995]; State of New York v Waterloo Stock Car Raceway, 96 Misc 2d 350 [1978]; County of Sullivan v Filippo, 64 Misc 2d 533 [1970]). Upon the facts fully discussed above, the court finds that the plaintiffs have failed to establish actual harm to humans, and that the plaintiffs have failed to establish the requisite probability of apprehended harm to humans. Inasmuch as the burden of proof is upon the plaintiffs to establish that the ingestion of TCP A at a concentration in excess of 50 ppb is harmful to humans, or potentially harmful as previously noted, and not as the plaintiffs have suggested that it is for the defendants to establish that the ingestion of TCP A at a concentration in excess of 50 ppb is not harmful to humans, and that having failed to do so the public nuisance is established, the public nuisance causes of action must be dismissed.
PRIVATE NUISANCE
A private nuisance has been defined as one which violates only private rights and produces damages to or threatens but one or a few persons (see, McFarlane v City of Niagara Falls, 247 NY 340 [1928]). Although a private nuisance traditionally has been defined as anything done to the hurt or annoyance of the lands of another (see, Heeg v Licht, 80 NY 579 [1880]; Swords v Edgar, 59 NY 28 [1874]) and although an essential feature of a private nuisance has been said to be interference with the use and enjoyment of land (see, Copart Indus. v Consolidated Edison Co., 41 NY2d 564, 568, supra, citing Blessington v McCrory Stores Corp., 198 Misc 291 [1950], affd 279 App Div 806, 807 [1952], affd 305 NY 140 [1953]; Queens County Bus. Alliance v New York Racing Assn., 98 AD2d 743 [1983]), a private nuisance embraces not a mere physical injury to the realty, but any injury to the rights of the owner or possessor as to his dealing with, possessing, or enjoying such realty (see, Kavanagh v Barber, 131 NY 211 [1892]; De Moll v City of New York, 163 App Div 676 [1914]; Turner v Coppola, 102 Misc 2d 1043 [1980]). Liability for private nuisance extends to injury to the person, as well as the lands of another (see, Swords v Edgar, 59 NY 28, supra; Walkowicz v Whitney’s Inc., 178 Misc 331 [1942]). A private nuisance is only a tort, and the remedy for it lies exclusively with the individual whose rights have been disturbed (see, United States v Hooker Chems. & Plastics Corp., 722 F Supp 960, supra).
*534 As noted above, SCWA had the opportunity to establish its cause of action for private nuisance either by proof of an invasion of the interest in SCWA’s private use and enjoyment of land by an invasion which is an abnormally dangerous condition or activity or negligent or unreasonable conduct. The burden is on SCWA to establish the private nuisance by a fair preponderance of the credible evidence (see, Mairs v Manhattan Real Estate Assn., 89 NY 498 [1882]; Hay v Cohoes Co., 2 NY 159 [1848]; Deutsch v National Props., 37 Misc 2d 860 [1961], affd 37 Misc 2d 863 [1963], mod 19 AD2d 823 [1963]). As discussed previously with respect to the public nuisance cause of action, the court has found that the plaintiffs have failed to establish that a concentration of TCP A in the drinking water in excess of 50 ppb poses an actual harm or a threatened harm to humans. Having so found SCWA cannot establish a private nuisance by abnormally dangerous condition or activity (see, Doundoulakis v Town of Hempstead, 42 NY2d 440 [1977]; Restatement [Second] of Torts § 520).
With respect to negligence or unreasonable conduct, the court observes that SCWA introduced no evidence to support its allegations that the defendants inadequately tested and formulated Dachtal and improperly marketed Dachtal for use in Suffolk County. Additionally, SCWA introduced no evidence as to any industry standard and the defendants’ failure to comply with such industry standard. Moreover, the defendants had changed their label and discontinued distribution of Dachtal in Suffolk County prior to the 50 ppb regulation going into effect and 21h years before the first acknowledged 50 ppb exceedance in an SCWA well.
As early as 1982 the defendants wrote to Dr. Kim setting forth their position regarding TCP A and requesting a meeting to discuss DCPA and its metabolites. In December 1983, the defendants wrote to Dr. Kim setting forth their position regarding what they believed to be the no observed effect level of DCPA, and confirming their cooperation with the Suffolk County Department of Health regarding testing of "allegedly contaminated wells”. In 1987 the defendants again wrote to Dr. Kim regarding amounts of DCPA and TCP A which would be permissible if found in the water supply.
In a letter dated March 6, 1987, the defendants analyze the Ninety Day Study previously discussed pointing out the absence of toxicological effects of TCP A. At no time during this period (early to mid-1980’s) did the plaintiffs urge the defendants to stop using DCPA or provide documentation contradict *535 ing the defendants’ interpretation of the data. In fact, up to almost the day of trial two of the plaintiffs’ experts, relying upon only part of the Ninety Day Toxicity Study, did not find TCP A harmful. Based on the foregoing, the defendants’ conduct cannot be considered negligent or unreasonable.
Accordingly, SCWA having failed to establish that the invasion of TCP A into the groundwater and of the interest in SCWA’s private use and enjoyment of land was as the result of the defendants’ engaging in an abnormally dangerous condition or activity or as the result of the defendants’ negligent or unreasonable conduct SCWA’s second cause of action is dismissed.
TRESPASS
SCWA asserts one cause of action for trespass. SCWA alleges that the defendants by their acts or omissions created a situation where the contaminants contained in the product Dachtal when applied to the soil by the users of the product were permitted to invade the property of the plaintiff, contaminating the water used for Shorewood’s wells numbered 1, 2, 4, 6 and 7, imperiling the plaintiffs’ business and its use and enjoyment of its land and the water thereunder which supplies wells numbered 1, 2, 4, 6 and 7. SCWA further alleges that as a result of the contamination of the groundwater SCWA has had to cease operations at wells numbered 1, 2 and 7, install treatment to be able to use well number 6 and will likely be forced to stop operations at well number 4 in the future.
The plaintiffs offered testimony as to the levels of contamination of public and private wells located in Suffolk County. The court is satisfied with the accuracy of the testing conducted by the plaintiffs and accept such testimony establishing the levels of TCP A in Suffolk County groundwater during the period in question (1979-1994).
The term trespass in its broadest sense has been held to mean any misfeasance, transgression or offense which damages another’s person, health, reputation or property (see, Serota v M. & M. Utils., 55 Misc 2d 286 [1967]). A trespass is any infringement of a property right of another (see, Suffolk County Water Auth. v Union Carbide Corp., NYLJ, May 2, 1991, at 28, col 1, supra) and it has been said that the right to have one’s property in its original condition, not changed by the well-meaning, but wrongful, conduct of others, is a property right, the invasion of which gives the right to damages (see, Serota v M. & M. Utils., 55 Misc 2d 286, supra; Bomptin Realty Co. v *536 City of New York, 196 Misc 218 [1949], revel on other grounds 276 App Div 1094 [1950]).
It has been held that "Trespass is an intentional harm at least to this extent: while the trespasser, to be liable, need not intend or expect the damaging consequence of his intrusion, he must intend the act which amounts to or produces the unlawful invasion, and the intrusion must at least be the immediate or inevitable consequence of what he willfully does, or which he does so negligently as to amount to willfulness.” (Phillips v Sun Oil Co., 307 NY 328, 331; see, Ivancic v Olmstead, 66 NY2d 349 [1985], rearg denied 66 NY2d 1036 [1985], rearg denied 67 NY2d 754 [1986].) A trespass is actionable, therefore, when there is an intent to do the very act which results in the immediate damage (see, Wood v United Air Lines, 32 Misc 2d 955 [1961], affd 16 AD2d 659 [1962], appeal dismissed 11 NY2d 1053 [1962]; Socony-Vacuum Oil Co. v Bailey, 202 Misc 364) notwithstanding that the act was done because of mistake or inadvertence (see, Phillips v Sun Oil Co., 307 NY 328, supra; Nance v Town of Oyster Bay, 41 Misc 2d 446 [1963], mod on other grounds 23 AD2d 9 [1965]), notwithstanding that the resulting damage is neither intended nor expected (see, Phillips v Sun Oil Co., 307 NY 328, supra; Van Alstyne v Rochester Tel. Corp., 163 Misc 258 [1937]) and notwithstanding that the trespassing conduct was not unlawful (see, Rager v McCloskey, 305 NY 75 [1953], rearg denied 305 NY 924 [1953]). It is not the directness of the damage but the directness of the invasion which is the test of liability for trespass and recovery for damages (see, Van Alstyne v Rochester Tel. Corp., 163 Misc 258, supra, citing Huffmire v City of Brooklyn, 162 NY 584 [1900]; Atwater v Trustees of Vil. of Canandaigua, 124 NY 602 [1891]).
As in the case of an act constituting a nuisance, control over the offending product or property is not a requisite element. Where a trespass is committed upon the rights or property of another, one who advised or directed the act to be committed may be held equally liable with the actual perpetrator of the trespass (see, Ketcham v Newman, 141 NY 205 [1894]; Goswami v H & D Constr. Co., 78 Misc 2d 99 [1974]; Suffolk County Water Auth. v Union Carbide Corp., supra). Similarly, one who incited, promoted, aided or abetted the commission of a trespass may be held equally liable with the actual perpetrator of the trespass (see, Oatka Cemetery Assn. v Cazeau, 242 App Div 415 [1934]; Goswami v H & D Constr. Co., 78 Misc 2d 99, supra).
The burden is upon SCWA to establish the trespass by a fair preponderance of the credible evidence (see, Mairs v Manhat *537 tan Real Estate Assn., 89 NY 498, supra; Hay v Cohoes Co., 2 NY 159, supra; Deutsch v National Props., 37 Misc 2d 860, supra). SCWA has established that the defendants manufactured and distributed Dachtal which until 1989 was sold in Suffolk County; that the defendants advised consumers that it be applied to the soil; that Dachtal contains DCPA; that DCPA ultimately breaks down to TCP A and, therefore, that the unlawful invasion of TCP A to the groundwater was direct and intentional. Additionally, for the reasons discussed below, SCWA has established that it has been tangibly and appreciably damaged by the invasion of TCP A in the groundwater, in that wells have been removed from service and granular activated carbon filtration systems installed.
The State Sanitary Code for Drinking Water Supplies, Public Water Systems provides at table 3 (10 NYCRR 5-1.52) that the maximum contaminant level for a UOC, of which TCP A is one, is .05 milligrams per liter (or 50 ppb). With respect to determining a maximum contaminant level (MCL) violation, the Sanitary Code provides: "If the results of a monitoring sample analysis exceed the MCL, the supplier of water shall collect one to three more samples from the same sampling point, as soon as practical, but within 30 days. An MCL violation occurs when at least one of the confirming samples is positive and the average of the initial sample and all confirming samples exceeds the MCL.” (10 NYCRR 5-1.52, table 3.)
The practice of SCWA was to take one additional sample and if that sample exceeded the MCL then the. well would be taken out of service until remediated. Inasmuch as the regulatory language provides that one to three more samples be collected and inasmuch as, of necessity, if the one additional sample exceeds the MCL, the average of the initial sample and the confirming sample must exceed the MCL, SCWA’s sampling practice is consistent with the regulatory scheme, and an MCL violation within the meaning of the regulation had occurred.
The State Sanitary Code provides "[i]n the case where the MCL is exceeded * * * the supplier of water will take the necessary steps to comply with [the maximum contaminant levels] to ensure the protection of the public health, including the undertaking of remedial feasibility studies and the installation of a suitable treatment process” (10 NYCRR 5-1.51 [a]). The State Sanitary Code also provides that "[t]he supplier of water and the person or persons operating a public water system shall exercise due care and diligence in the maintenance and supervision of all sources of the public water system to prevent, *538 so far as possible, their pollution and depletion” (10 NYCRR 5-1.71 [a]). Similarly, the State Sanitary Code provides that "[t]he supplier of water and the person or persons operating a water treatment plant or distribution system shall exercise due care and diligence in the operation and maintenance of these facilities and their appurtenances to ensure continued compliance with the provisions of [10 NYCRR subpart 5-1]” (10 NYCRR 5-1.72 [b]). A violation of the Sanitary Code, by ex-ceedance of an MCL, would expose SCWA to the risk of fine, imprisonment or both (see, Public Health Law §§ 12, 12-b, 229, 1103) as well as permit suspension or closure (see, 10 NYCRR 76.8 [8]).
In light of the obligations imposed upon a supplier of public water by regulation to provide water in continued compliance with the maximum contaminant levels set forth in the regulations and in the absence of such compliance to undertake a remedial feasibility study or to install a suitable treatment process; and, in light of the court’s finding above that an MCL violation may be established by an exceedance and a single sample exceeding the MCL, the court concludes that SCWA’s taking a well out of service until remediated by the installation of a granular activated carbon filtration system, upon the second TCP A sample in excess of 50 ppb, is consistent with the regulatory scheme and its obligations thereunder. The court also concludes that the taking of a well out of service and the installation of a granular activated carbon filtration system so as to be able to restore such well to service, as the result of TCP A concentration in excess of 50 ppb constitutes a tangible and appreciable injury to the property of SCWA. There being a direct and intentional invasion of SCWA land by the chemical TCP A which the defendants advised consumers to be applied to the soil and permitted to be released into the groundwater to SCWA’s tangible and appreciable injury, the court concludes that SCWA has established a trespass by a fair preponderance of the credible evidence.
[Portions of opinion omitted for purposes of publication.]